SQUARE LINER 360°, INC.,
Appellant/Cross Appellee,

v.

Finis Lavell CHISUM and Chief Industries, Inc., Appellees/Cross Appellants.

Nos. 81–2342, 81–2396.

United States Court of Appeals,
Eighth Circuit.

Submitted June 14, 1982.

Decided Oct. 12, 1982.

Rehearing Denied Dec. 22, 1982.

Jan Stuurmans, Stuurmans & Kelly, P. A., Minneapolis, Minn., for appellant/cross-appellee.

Orrin M. Haugen, Haugen & Nikolai, Henry H. Feikema, Smith, Juster, Feikema, Malmon & Kaskvitz, Minneapolis, Minn., James Head, Head & Johnson, Tulsa, Okl., for appellees/cross-appellants.

Before MILLER,* Judge, ARNOLD, Circuit Judge, and STEVENS,** District Judge.

MILLER, Judge.

These appeals are from an action for declaratory judgment of patent invalidity by appellant-cross appellee Square Liner 360°, Inc. ("Square Liner") and a counterclaim by appellees-cross appellants Finis Lavell Chisum ("Chisum") and Chief Industries, Inc. ("Chief") for infringement of patent No. 3,630,066 (" '066") [1] and patent No. 3,888,100 (" '100").[2] After a five-week jury trial, the '066 patent was found to be valid but not infringed, the '100 patent was found to be valid and infringed, and Chisum and Chief,[3] his exclusive licensee, were awarded $500,000 damages ($78,000 to Chisum and $422,000 to Chief). In a memorandum order, the trial court denied Square Liner's post trial motion for judgment NOV or a new trial with respect to the '100 patent, denied Chisum's motions for judgment NOV with respect to the '066 patent, treble damages, prejudgment interest, and attorneys' fees, and granted Chisum's motion for a permanent injunction against future infringement as follows:

IT IS HEREBY ORDERED:

---

* The Honorable Jack R. Miller, Judge, United States Court of Customs and Patent Appeals, sitting by designation.

** The Honorable Joseph E. Stevens, Jr., United States District Judge, United States District Court for the Western and Eastern Districts of Missouri, sitting by designation.

1. Issued December 28, 1971, on application No. 810,940 for: "Apparatus for Returning Vehicle Body and Frame Components to their Original Locations During Repair and Servicing of Vehicles."

2. Issued June 10, 1975, on application No. 211,-527 for: "Auto Body Frame and Straightening Devices."

3. Except where the context otherwise requires, "Chisum" will hereinafter be used to refer to both appellees-cross appellants Chisum and Chief.

Plaintiff Square Liner 360°, Inc., its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the Order by personal service or otherwise, are hereby restrained and enjoined from and after the date hereof and until the date of expiration of said United States Letters Patent, from directly or indirectly infringing said United States Letters Patent No. 3,888,100 by making, using, or selling, or causing to be made, used, or sold, automobile frame straightening devices having been found to be infringing, and any infringing equivalents thereof.

This injunction does not include any repairs that Square Liner 360°, Inc., may make in the ordinary course of business to machines previously sold by it for which defendants have obtained monetary relief.

We affirm on the validity and infringement issues, vacate the award of damages and the injunction, and remand for a new trial on damages.

## BACKGROUND

The patents in suit relate to an automobile frame straightening machine. Chisum, the patentee, developed and built a frame straightening machine in 1967, which he used commercially in his Big Corner Body Shop in Anchorage. Also in 1967, Chisum sent a disclosure of a frame straightening machine to Kessler Sales Corporation, who then sent literature to 50 corporations seeking a manufacturer for the machine. No inquiries were forthcoming. On March 29, 1969, Chisum filed patent application No. 810,940, disclosing an invention comprising a platform with two treadways onto which a damaged vehicle may be driven; a vertically elongatable "pull tower" on a "pedestal" which is movable to a desired position relative to the vehicle; a chain or other "tension member" connected between the pull tower and the vehicle; and another tension member on the opposite side of the vehicle attaching the vehicle to the platform. In operation, the pull tower is vertically elongated, e.g., by means of a hydraulic ram. The chain, which is connected to the part of the vehicle to be pulled, runs from the vehicle to a pulley at the base of the pull tower, around the pulley, then vertically to the top of the pull tower. As the tower elongates, the chain is pulled, which, in turn, pulls on the part of the vehicle to which it is attached.

Chisum's first application contained both broad generic claims, not limited to embodiments having a pedestal, and species claims having a pedestal limitation. During prosecution of the application, the generic claims were rejected over prior art. Both the genus and the species claims were cancelled, and revised species claims were added as an amendment to avoid a nonart rejection under 35 U.S.C. § 112. Regarding the amendment adding the new species claims, Chisum remarked that "the contribution that applicant has made to the art is the pedestal .... The pedestal is the key to applicant's invention.... It is the pedestal which is noticeably absent from the patent references cited by the examiner." Shortly before this application matured into the '066 patent, Chisum on December 23, 1971, filed continuation-in-part ("CIP") application No. 211,527, with generic claims of similar breadth to those cancelled from the first application. The CIP also contained several drawings (figures 16 through 23B) illustrating different "treadways." The CIP application matured into the '100 patent on June 10, 1975, with 36 claims. Claims 1–20 are generic claims for an automobile frame straightening machine and do not require the presence of a pedestal. Claims 21–32 are directed to various embodiments of the treadway. Claims 33–36 pertain to the pull tower.

On August 30, 1976, Chisum filed reissue application No. 718,601, for reissuance of the '100 patent, cancelling treadway claims 21–32 (figures 16–23B) and corresponding text. In his reissue petition, Chisum declared:

[T]hat petitioner verily believes that the original patent is wholly or partially invalid for the following reasons:

....

(c) That all or a part of the subject matter illustrated in the drawings of FIGURES 16 throgh [sic] 23B and the description and claims relating thereto, was in prior public use and on sale before December 23, 1970, that is, more than one year before the application date for Patent 3,888,100 [December 23, 1971];

. . . .

(e) That your petitioner knew that the subject matter relating to FIGURES 16 through 23B were in public use more than one year prior to December 23, 1971, but was under the mistaken belief that since the application was to be a continuation-in-part of copending application No. 810,-940 which was filed March 27, 1969 . . . he was entitled to a patent on such subject matter and was mistakenly under the erroneous impression that such public use and sale did not bar him from securing a patent on the subject matter illustrated in drawing FIGURES 16 through 23B;

. . . .

(h) That the inclusion of the subject matter relating to FIGURES 16 through 23B in [CIP] application No. 211,527 was by inadvertency and mistake in that your petitioner is not experienced in patent matters, nor the laws relating to the issuance of patents and particularly the laws relating to continuation-in-part applications, and that this subject matter was not included in application 211,527 for any willful, fraudulent or deceptive intent.

During contested reissue proceedings in which both Chisum and Square Liner participated, the examiner considered both old and new art, and held that the claims on appeal (1–2, 6, 9, 11–15, 18, 20, 33, 35–36) were patentable over that art. He also considered the Big Corner machine, which was commercially used more than one year before the parent application was filed, and the Kessler machine, disclosed by Chisum to Kessler Sales Corporation more than one year before the filing date of the parent application. As to these machines, he held that there was no anticipation of the claims under 35 U.S.C. § 102(b), because the ma-

chines did not have a vertically elongatable pull tower, and that even if the machines were prior art, the '100 and '066 claims would not have been obvious in view thereof.

During the reissue proceedings, Square Liner also raised the issue of fraud and inequitable conduct, alleging that Chisum's failure to disclose the Big Corner and Kessler machines to the Patent and Trademark Office ("PTO") during prosecution of the applications for the '066 and '100 patents constituted fraud on the PTO, as did the failure to disclose the prior public use and sale of the invention to which the treadway claims were directed. The PTO did not consider the fraud issue, but suspended proceedings on the reissue application pending the decision of the district court in this litigation.

At trial, the court granted Chisum's motions for a directed verdict on the issues of fraud and misconduct, late claiming, file wrapper estoppel, and recapture.

## OPINION

### I. VALIDITY OF THE '100 PATENT

*A. Obviousness*

In order to ascertain whether, in the words of 35 U.S.C. § 103, "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains," it is necessary to analyze the claims of the '100 patent, for it is the claims that define the metes and bounds of the patentee's property right in his invention. Square Liner is charged with infringement of claims 1–2, 6, 9, 11–15, 18, 20, 33, 35–36. Claims 1 and 33 are independent claims and are the broadest claims on appeal. Claim 1 reads:

Apparatus for applying equal and opposite forces to a mechanical structure such as an automotive vehicle body or frame comprising:

a. a platform system;

b. means on said platform system for supporting said structure;

c. at least one vertical pull tower means pivotally connected about a vertical axis fixed to said platform system rotatably movable to a desired position relative to said structure;

d. means to vertically elongate said tower;

e. means to connect a tension member between said vertically elongate means and a first portion of said structure to apply a first force to said structure; and

f. means to apply a second force between a second portion of said structure and said platform system.

Claim 33 is directed to a specific embodiment of a pull tower.[4] The remaining claims are dependent on either claim 1 or claim 33 and add further limitations to those claims.

■ In reviewing the trial court's determination of unobviousness (denial of Square Liner's motion for judgment NOV), it is necessary to ascertain (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; and (3) the level of ordinary skill in the pertinent art. *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

Square Liner relies on several patents and publications which variously show platform systems for supporting vehicles; vertical pull towers which are vertically elongatable and are used, *e.g.,* for moving railroad cars; and tension members (chains) running from a pull tower to the object to be pulled. No reference shows the combi-

nations claimed by Chisum; however, Square Liner argues that combining the various prior art elements to make the combination claimed would have been obvious to a person of ordinary skill in the art at the time the invention was made.

It is important at this point to determine the meaning of the claim language, "means to vertically elongate said tower." The specification of the '100 patent discloses a telescoping tower elongated by a hydraulic ram located therein. Square Liner argues that a pull tower in a prior art platform-type automobile frame straightening machine (of John Bean), which is elongatable by an extension bolted to the tower, has "means to vertically elongate said tower." The "means to" language used in claim 1 is specifically provided for in 35 U.S.C. § 112, which reads in relevant part:

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

We are persuaded that equivalents of a hydraulic ram for elongating towers would be limited to mechanical devices for achieving the same function and that a tower which may be elongated by the insertion of an extension does not possess the equivalent of a hydraulic ram. Therefore, the prior art pull tower does not have "means to vertically elongate said tower."[5] The other

---

**4.** Claim 33 reads:
Pull tower apparatus for use in a system for applying forces to a mechanical structure such as an automotive vehicle body or frame, comprising
a. a vertically supported housing means comprising a cylindrical tube,
b. operating means comprising a cylindrical means reciprocably and rotatably received in said housing,
c. hydraulic actuator means inside said housing below said operating means, one of a cylinder and piston end of said actuator supported by said housing, the other of said cylinder and piston end of said actuator connected to the bottom end of said operating means;

d. a pull chain;
e. means connected to said operating means to receive said pull chain;
f. idler pulley means, to receive said chain attached to a ring means slidably and rotatably surrounding said housing and including means to dock said ring means to said housing; and
g. means to support said pull tower means in a vertical position.

**5.** Even in the PTO reissue proceedings, where "means plus function" language is not considered to be limited to equivalents of the means disclosed in the specification, *In re Reuter,* 651 F.2d 751, 210 U.S.P.Q. 249 (C.C.P.A. 1981), the examiner rejected Square Liner's argument.

prior art relied on by Square Liner to show "means to vertically elongate" pull towers is even less directly related to the platform-type automobile frame straightening machine claimed by appellant.

Of course, virtually all mechanical inventions are new combinations of old elements. *Plastic Container Corp. v. Continental Plastics of Oklahoma, Inc.,* 607 F.2d 885, 904 n.46, 203 U.S.P.Q. 27, 43 n.46 (10th Cir. 1979), *cert. denied,* 444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 648 (1980); *Republic Industries, Inc. v. Schlage Lock Co.,* 592 F.2d 963, 969, 200 U.S.P.Q. 769, 777 (7th Cir. 1979); *Reiner v. I. Leon Co.,* 285 F.2d 501, 503, 128 U.S.P.Q. 25, 27 (2d Cir. 1960), *cert. denied,* 366 U.S. 929, 81 S.Ct. 1649, 6 L.Ed.2d 388 (1961). The pertinent question is not whether each element was known or obvious, but whether, considering the invention as a whole, it would have been obvious to combine the elements in the claimed relationship, and a court may look to such evidence of unobviousness as new and advantageous results achieved by the claimed invention, industry acceptance, commercial success, and copying by others. *Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966); *Span-Deck, Inc. v. Fab-Con, Inc.,* 677 F.2d 1237, 1241 (8th Cir. 1982); *Nickola v. Peterson,* 580 F.2d 898, 911 n.21, 198 U.S.P.Q. 385, 400 n.21 (6th Cir. 1978), *cert. denied,* 440 U.S. 961, 99 S.Ct. 1504, 59 L.Ed.2d 774 (1979); *Santa Fe-Pomeroy, Inc. v. P & Z Co., Inc.,* 569 F.2d 1084, 1098, 197 U.S.P.Q. 449, 460–61 (9th Cir. 1978); *Kelley Manufacturing Co. v. Lilliston Corp.,* 200 U.S.P.Q. 670, 676–77 (E.D.N.C.1978). In the present case, the record is replete with testimony regarding the advantages of the Chisum invention over prior art machines. It has achieved industry acceptance and commercial success. There is also evidence that the infringing Square Liner machine was copied from a disclosure made by Chisum to one of the principals of Square Liner. Therefore, we hold that the invention of independent claims 1 and 33 of the '100 patent, and the claims dependent thereon, would not have been obvious to a person of ordinary skill in the art at the time the invention was made. *See Clark Equipment Co. v. Keller,* 570 F.2d 778, 789, 197 U.S.P.Q. 209, 217 (8th Cir.), *cert. denied,* 439 U.S. 825, 99 S.Ct. 96, 58 L.Ed.2d 118 (1978).

Square Liner assigns error to the admission into evidence of Chisum's exhibit 14, a letter from the Marquette Corporation. During the development of his machine, Chisum sought marketing assistance from the Marquette Corporation, a manufacturer of frame straightening equipment. Exhibit 14 is the reply Chisum received from the manager of Marquette Corporation's Frame Equipment Department shortly before Chisum filed his original patent application. Although declining the assistance Chisum sought, the letter stated: "I personally believe that your approach is most original and practical."

This letter was offered in evidence to prove the truth of the matter asserted, *viz.,* that Chisum's invention was believed by the manager of Marquette's Frame Equipment Department to be "most original and practical." Therefore, since it is not offered by the author, it is hearsay within the meaning of Fed.R.Evid. 801(c). Chisum argues that the letter is admissible under the business records exception to the hearsay rule, Fed.R.Evid. 803(6).[6] To fall

---

6. This rule provides:

**Hearsay Exceptions; Availability of Declarant Immaterial**

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

**(6) Records of regularly conducted activity.** A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling

within this exception, it is necessary for the offered record to have been "kept in the course of a regularly conducted business activity," that "it was the regular practice of that business activity to make" that record, and that "the source of information or the method or circumstances of preparation" does not indicate a "lack of trustworthiness." There is no evidence that Chisum regularly kept such statements of others regarding the originality and practicality of his invention. We agree with Square Liner that for purposes of proving novelty or unobviousness, the letter does not satisfy the requirements of Rule 803(6).

■ However, the mere fact that the letter was improperly admitted is not enough to require reversal. The error must affect a substantial right of the objecting party, *Gilliam v. Omaha,* 524 F.2d 1013, 1015 (8th Cir. 1975), and the burden of showing prejudice rests on the appellant. *Airline Pilots Association, International v. Northwest Airlines, Inc.,* 415 F.2d 493, 496 (8th Cir. 1969), *cert. denied,* 397 U.S. 924, 90 S.Ct. 931, 25 L.Ed.2d 105 (1971). In the course of the five week trial, a great amount of evidence was introduced on the question of obviousness. Exhibit 14 was just one more shaft in a quiver already full. *Black Hills Jewelry Manufacturing Co. v. Gold Rush, Inc.,* 633 F.2d 746, 753, 208 U.S.P.Q. 631, 637 (8th Cir. 1980); *Koppinger v. Cullen-Schiltz & Associates,* 513 F.2d 901, 907 (8th Cir. 1975).

### B. File Wrapper Estoppel and Recapture

Square Liner argues that the '100 patent is invalid by reason of "file wrapper estoppel and recapture," asserting that Chisum "acquiesced in the abandonment and cancellation of generic claims" from his original application, which matured into the '066 patent; and then sought to recapture those claims by claim 1 in his continuation-in-part application, which matured into the '100 patent; further, that claim 1 "is of similar breadth as [*sic*] the generic claims relinquished in obtaining the '066 patent."

■ File wrapper estoppel is a tool of construction that places a limitation on a patentee's use of the doctrine of equivalents, under which a claim that does not literally read on an accused device may still be infringed thereby if the accused device "performs substantially the same function in substantially the same way to obtain the same result." *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). Thus, where a patentee has, during prosecution before the PTO, amended his claims to add a limitation (or cancelled claims containing such a limitation) to overcome a rejection and obtain a patent, he is estopped from later contending in an infringement action that the claims should be interpreted as if that limitation were not present. *Graham v. John Deere Co.,* 383 U.S. 1, 33–34, 86 S.Ct. 684, 701, 15 L.Ed.2d 545 (1966); *Exhibit Supply Co. v. Ace Patents Corp.,* 315 U.S. 126, 136–37, 62 S.Ct. 513, 518, 86 L.Ed. 736 (1942); *Nationwide Chemical Corp. v. Wright,* 584 F.2d 714, 718–19, 200 U.S.P.Q. 257, 260–61 (5th Cir. 1978); *Parmelee Pharmaceutical Co. v. Zink,* 285 F.2d 465, 472, 128 U.S.P.Q. 271, 276 (8th Cir. 1961). *See* 4 Deller's Walker on Patents § 234 (2d ed. 1965 & Supp.1982) and cases cited therein.

■ Square Liner would have the court apply file wrapper estoppel—not to limit the range of equivalents that may be asserted by Chisum, but as a basis for holding claims in a subsequent patent invalid. We are aware that a district court in *Transportation Design & Technology, Inc. v. General Motors Corp.,* 212 U.S.P.Q. 574 (C.D.Cal. 1980), has reached this result. However, the opinion in that case does not persuade us to create a new, nonstatutory bar to patentability under the facts of this case.

Having resolved this *invalidity* question in favor of Chisum, it is necessary to consider Square Liner's further contention that "Chisum is estopped from asserting such generic claims under the doctrine of file wrapper estoppel."[7] Square Liner quotes

---

of every kind, whether or not conducted for profit.

7. Square Liner also argues that the claims are invalid by reason of "recapture." It is unclear

from *Jamesbury Corp. v. United States,* 183 U.S.P.Q. 484, 490 (Ct.Cls. Trial Div.1974), *aff'd* 518 F.2d 1384, 187 U.S.P.Q. 720 (Ct. Cls.1975):

> Specifically, since the applicants had narrowed the claims in their parent ... application, ... in view of prior art cited by the Patent Office to exclude the Freeman V-notch design, it would be improper to permit them, by way of the later submitted claim 14 in the ... continuation-in-part application, to recapture subject matter that they had willingly relinquished. To do so would ignore the well-established doctrine of "file wrapper estoppel" which does not allow recapture of relinquished subject matter under circumstances present in this case.

The trial judge in *Jamesbury* cited *Exhibit Supply Co. v. Ace Patents Corp.,* 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736 (1942), in which the Supreme Court said:

> It follows that what the patentee, by a strict construction of the claim, has disclaimed ... cannot now be regained by recourse to the doctrine of equivalents, which at most operates, by liberal construction, to secure to the inventor the full benefits, not disclaimed, of the claims allowed.

*Id.* at 137, 62 S.Ct. at 519. However, we note that the *Exhibit Supply Co.* case did not involve claims in a continuation-in-part application, filed while the parent application, from which such claims had been cancelled, *was still pending,* as in this case. This distinction is crucial to the determination of whether Chisum "acquiesced in the abandonment" of the generic claims or relinquished or disclaimed the subject matter thereof. During the prosecution of the '066 patent, Chisum made clear his intention to file a continuing application. A potential divisional application was twice mentioned, and in one amendment Chisum requested the PTO to "Cancel non-elected claims 10, 11, 15–19, without prejudice to the filing of divisional applications." In the final rejection by the PTO examiner (which prompted cancellation of the generic claims), the generic claims were rejected on prior art, but the species claims having a pedestal limitation were not. This was recognition that the species claims contained patentable subject matter. Chisum pursued the most logical course—he cancelled the finally rejected generic claims and secured allowance of species claims with pedestal limitations. Then, while that application was still pending, he filed a continuation-in-part application, as permitted by 35 U.S.C. § 120 (**"Benefit of earlier filing date in the United States"**) and 37 C.F.R. § 1.60, in which generic claims were presented for further prosecution.[8]

whether Square Liner regards this as an issue apart from file wrapper estoppel. It is true that the '100 patent extends Chisum's term of patent coverage for his frame straightening machines. However, Congress intended that a patent issued on a continuing application not be limited to the term of the patent issuing on the parent. The preliminary draft of what is now 35 U.S.C. § 120, which provides for continuing applications, stated that "[t]he term of the patent granted on said later application shall not extend beyond the date of expiration of the patent if any, which may be granted on the earlier application." House Comm. on the Judiciary, 81st Cong., 2d Sess., Proposed Revision and Amendment of the Patent Laws 21 (Comm. Print 1950). However, as finally enacted, the statute contains no such limitation. We do not consider that Square Liner intends, by its "recapture" argument, to invoke the doctrine of double patenting, which was argued separately by Square Liner during the reissue proceedings before the PTO, but was not made an issue at trial or on this appeal.

8.  An applicant's right to amend claims to overcome prior art after a final rejection is governed by PTO rule, 37 C.F.R. § 1.116, which provides in relevant part:

    **Amendments after final action.**

    (a) After final rejection or action (§ 1.113) amendments may be made cancelling claims or complying with any requirement of form which has been made, and amendments presenting rejected claims in better form for consideration on appeal may be admitted; but the admission of any such amendment or its refusal, and any proceedings relative thereto, shall not operate to relieve the application from its condition as subject to appeal or to save it from abandonment under § 1.135.

    (b) If amendments touching the merits of the application be presented after final rejection, or after appeal has been taken, or when such amendment might not otherwise be proper, they may be admitted upon a showing of good and sufficient reasons why they are necessary and were not earlier presented.

When an application satisfies the requirements for continuing application status, as in this case, the parent and continuing applications "are to be considered as parts of the same transaction, and both as constituting one continuous application, within the meaning of the law." *Godfrey v. Eames,* 68 U.S. (1 Wall.) 317, 326, 17 L.Ed. 684 (1863). Thus, Chisum cancelled generic claims from the parent application and, before issuance of the '066 patent and as part of what was, as a matter of law, the same transaction, added generic claims to the continuation-in-part application. This action cannot properly be considered relinquishment, disclaimer, or acquiescence in abandonment of the subject matter of the generic claims.[9]

Accordingly, the trial court properly directed a verdict for Chisum on this issue.

## C. Late Claiming

Square Liner also argues that the '100 patent claims on appeal are invalid for "late claiming" and that the trial court erred in directing a verdict for Chisum on this point.

The late claiming doctrine has its origins in *Muncie Gear Works, Inc. v. Outboard, Marine & Mfg. Co.,* 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171 (1942). Proponents of the doctrine read into the *Muncie Gear* opinion a prohibition against adding claims to an application to cover a previously unclaimed aspect of the invention more than one year after an adverse public use or sale of an embodiment of the invention incorporating that aspect. The late claiming doctrine was used to invalidate patent claims in *Kahn v. Dynamics Corp. of America,* 508

F.2d 939, 184 U.S.P.Q. 260 (2d Cir.), *cert. denied,* 421 U.S. 930, 95 S.Ct. 1657, 44 L.Ed.2d 88 (1975), and *Honeywell, Inc. v. Sperry Rand Corp.,* 180 U.S.P.Q. 673 (D.Minn.1973).

An analysis of the *Muncie Gear* case is necessary to ascertain the scope and extent of the purported "late claiming" doctrine. In that case, the Court considered the validity of four claims (numbered 11, 12, 13, and 14) of a patent which "solved the problems of cavitation by relatively large and fast outboard motors." The patentee had filed his original application on August 25, 1926, but the claims in question were added by amendment on March 30, 1929. The "invention as finally claimed" was first put into public use by an exclusive licensee under the patent in January or February of 1926. The first public use by a competitor came one year later. All of the later added claims were held invalid.

Each of the involved claims included an anticavitation plate as an essential element. In claims 12 and 14 the patentee had "for the first time made claims relating to the exterior surface of the housing." 315 U.S. at 762, 62 S.Ct. at 866. "Claim 12 described the housing as having 'unbroken outer wall surfaces at each side,' and claim 14, as having 'smooth and unbroken walls.' Claims 11 and 13 were silent on the subject." *Id.* at 762–63, 62 S.Ct. at 866. However, the *specification* was amended to describe the housing as having "relatively smooth and substantially stream-line [*sic*] surfaces." *Id.* at 763, 62 S.Ct. at 867.

Clearly, claims 12 and 14 were invalid, because they relied for their support on the

Where an applicant desires to make substantive amendments after a final rejection which introduce new questions of patentability, the usual procedure is to file a continuing application. The PTO's Manual of Patent Examining Procedure, setting forth PTO policy, indicates in section 714.13 that the examiner may refuse to enter an amendment after final rejection if, *inter alia,* "[t]he claims as amended present new issues requiring further consideration or search."

9. *Jamesbury* is distinguishable, because the claim involved there (claim 14) was not introduced into the continuation application until

after the parent application (containing species claims) had been abandoned, 183 U.S.P.Q. at 490; whereas, in this case, claim 1 was included in the continuation-in-part application *prior to* issuance of the '066 patent and had, therefore, never been finally relinquished, disclaimed, or abandoned by Chisum before the PTO. Also, we note that, as in the *Transportation Design & Technology* case, *supra,* the trial judge actually employed a nonstatutory bar of *estoppel* rather than a limitation on the patentee's use of the doctrine of equivalents by *file wrapper* estoppel.

new matter (*i.e.,* the description of the exterior surface of the housing) introduced by the March 30, 1929 amendment. *See In re Rasmussen,* 650 F.2d 1212, 211 U.S.P.Q. 323 (C.C.P.A.1981). The problem is with the *Muncie* Court's invalidation of claims 11 and 13. Both were fully supported by the original specification. It has been suggested that these claims, which include the anticavitation plate but not the smooth or unbroken housing surface, were invalid for late claiming, *i.e.,* they were allegedly first added to the patent application more than two years [10] after an intervening adverse public use of the claimed invention. Those who advance this suggestion further contend that the anticavitation plate was not claimed until the amendment was filed more than two years after a competitor made public use of the invention. *See, e.g.,* Gardner, *Late Claiming,* 9 Idea 321, 324 (1965). However, this is without merit, because the anticavitation plate *was* claimed in the original application. *See* 2 I. Kayton, Patent Preparation & Prosecution Practice ch. 8 at 9 (1976).

The reason for the *Muncie* Court's invalidation of claims 11 and 13 is clear from its remark that even the patentee "conceded that [anti-] cavitation plates are old in the Art." 315 U.S. at 762, 62 S.Ct. at 866. Thus, claims 11 and 13 were invalid because they did not contain the limitation of a smooth or unbroken exterior housing surface, the feature which the Court considered essential to distinguish the invention over the prior art.[11]

The conclusion that *Muncie Gear* merely stands for a prohibition against new matter is further supported by the Court's concluding observation that "the original application, wholly *failed to disclose* the invention now asserted ...." *Id.* at 768, 62 S.Ct. at 869. (Emphasis supplied.) This evaluation of *Muncie Gear* is in accord with a majority of the courts that have considered the late claiming doctrine. *See, e.g., Westphal v.*

*Fawzi,* 666 F.2d 575, 212 U.S.P.Q. 321 (C.C. P.A.1981); *Faulkner v. Baldwin Piano & Organ Co.,* 561 F.2d 677, 195 U.S.P.Q. 410 (7th Cir. 1977), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1450, 55 L.Ed.2d 495 (1978); *Cardinal of Adrian, Inc. v. Peerless Wood Products, Inc.,* 515 F.2d 534, 185 U.S.P.Q. 712 (6th Cir. 1975); *Price v. Lake Sales Supply R. M., Inc.,* 510 F.2d 388, 183 U.S.P.Q. 519 (10th Cir. 1974); *Locklin v. Switzer Brothers, Inc.,* 299 F.2d 160, 131 U.S.P.Q. 294 (9th Cir. 1961), *cert. denied,* 369 U.S. 861, 82 S.Ct. 950, 8 L.Ed.2d 18 (1962); *Chicopee Manufacturing Corp. v. Kendall Co.,* 288 F.2d 719, 129 U.S.P.Q. 90 (4th Cir.), *cert. denied,* 368 U.S. 825, 82 S.Ct. 44, 7 L.Ed.2d 29 (1961).

Because Chisum's specification fully supports the claims on appeal and because those claims do not rely on new matter, the trial judge properly directed a verdict for Chisum on the late claiming issue.

*D. Fraud and Misconduct*

■ Square Liner further argues that the trial court erred in granting Chisum's motion for a directed verdict on the issue of fraud and misconduct before the PTO during the prosecution of the involved patents. Specifically, it alleges that failure to disclose to the PTO the public use or sale of the invention of claims 21–32 of the '100 patent and the Big Corner and Kessler machines constituted fraud or misconduct. It is, of course, well established that an applicant has a duty of candor and disclosure during proceedings before the PTO and that failure to satisfy this duty can render invalid or unenforceable a patent issuing from such proceedings. *See generally* Miller, *Fraud on the PTO,* 58 J.Pat.Off.Soc'y 269 (1975).

■ The burden of establishing fraud or misconduct rests with Square Liner. In *Clark Equipment Co. v. Keller,* 570 F.2d at 790, 197 U.S.P.Q. at 218, this court said:

A patent applicant has an uncompromising duty toward the Patent Office to

---

**10.** The statutory grace period after a public use or sale is now one year. 35 U.S.C. § 102(b).

**11.** It appears that the Court, early in its opinion, dropped further (and unnecessary) consideration of claims 11 and 13, and addressed the balance of its opinion only to claims 12 and 14 and the new matter issues associated therewith.

374

disclose all pertinent facts. However, a party seeking to establish fraud on the Patent Office because of a failure of full disclosure bears a heavy burden of persuasion: fraud on the Patent Office must be proved by clear, convincing and substantial evidence. *Norton v. Curtiss,* 433 F.2d 779, 797, 167 USPQ 532, 546–47 (C.C. P.A.1970).

In addition to proving lack of disclosure of a material fact during prosecution, it was also Square Liner's burden to prove that the omission was wrongful, willful, or in bad faith. As this court said in *Pfizer, Inc. v. International Rectifier Corp.,* 538 F.2d 180, 186–87, 190 U.S.P.Q. 273, 278–79 (8th Cir. 1976), *cert. denied,* 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977):

> [T]he standard is not one of strict liability for innocent or even negligent omissions or misstatements before the Patent Office. *Schnadig Corp. v. Gaines Manufacturing Co.,* 494 F.2d 383, 393 (6th Cir. 1974). Rather, to result in refusal to enforce a patent, the misconduct must be accompanied by "some element of wrongfulness, willfulness, or bad faith." *Parker v. Motorola, Inc.,* 524 F.2d 518, 535 (5th Cir. 1975); *see Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 814–815, 65 S.Ct. 993, 997–998, 89 L.Ed. 1381 (1945) (a "willful act * * * which rightfully can be said to transgress equitable standards of conduct"). This requirement of proof has been uniformly applied in infringement actions by a majority of the circuits to claims of both fraud and lesser inequitable conduct. Moreover, proof of misconduct under either theory must be established by "clear, unequivocal and convincing" evidence. *United States v. American Bell Telephone Co.,* 167 U.S. 224, 251, 17 S.Ct. 809, 42 L.Ed. 144 (1897); *accord, Schnadig Corp. v. Gaines Manufacturing Co., supra* at 392;

*Monsanto Co. v. Rohm & Haas Co., supra* [456 F.2d 592] at 601 n.14. [Footnotes omitted.]

As to the prior public use or sale of the invention of claims 21–32 in the '100 patent, those claims have been disclaimed, and the error in including those claims was brought to the attention of the PTO via reissue proceedings. Chisum asserts in his reissue declaration that the inclusion of those claims in the application for the '100 patent was due to his mistaken belief that he was entitled to the parent application's filing date for those claims; also, that their inclusion was not "for any willful, fraudulent or deceptive intent." Square Liner has presented no contrary evidence; nor has it produced any evidence of "wrongfulness, willfulness, or bad faith" in connection with the Big Corner and Kessler machines.[12] Therefore, no submissible case of fraud or misconduct was made out, and the trial court properly granted Chisum's motion for a directed verdict.

## II. MOTION FOR MISTRIAL

The evening before the pretrial conference and approximately a week before trial, Square Liner's attorney called the trial judge's office and requested a continuance so that new counsel could be substituted. The trial judge denied the "motion." On the fourth day of the trial, the attorney approached the bench, represented that he was physically and emotionally unable to continue the trial, and moved for a mistrial in order that Square Liner would be able to appoint substitute counsel. No medical evidence was presented, and the motion was denied. On appeal, Square Liner contends that the inexperience of its attorney resulted in a denial of its "day in court."

Decisions regarding continuance, mistrial, and substitution of counsel are

---

12. Chisum advanced persuasive arguments to the PTO during reissue proceedings that the Big Corner machine constituted an experimental use and that the Kessler machine was neither offered for sale nor described in a printed publication. However, the PTO did not find it necessary to resolve these questions, holding instead that the '100 patent claims were patentable over those machines even assuming, arguendo, that they were prior art. We agree, and that the PTO would have issued the patent even if it had considered the alleged prior art negates the omission of a material fact.

within the broad discretion of the trial judge. In a post trial memorandum order, the trial judge noted that the attorney for Square Liner had filed the complaint over five years earlier, had engaged in extensive discovery, and had represented his client before the PTO in reissue proceedings involving the patents in suit. He observed that the attorney had been able to competently "examine and cross-examine witnesses, make objections, and . . . competently represent his clients . . .," and remarked that any contention that Square Liner's position on the merits did not become known because of its attorney's lack of trial skills was "completely and wholly without merit."

■ Square Liner asserts that "[a]ny objective review of the transcript of this trial demonstrates the fact that appellant has not had its day in court." We are not persuaded. Square Liner has provided no objective evidence that its attorney was physically and mentally unable to competently try the case, or that his inexperience resulted in a miscarriage of justice. Ac-

cordingly, we are satisfied that the trial judge did not abuse his discretion in denying Square Liner's motion for mistrial.

## III. DAMAGES

■ Damage awards for patent infringement are governed by 35 U.S.C. § 284,[13] which allows recovery of "damages adequate to compensate for the infringement but in no event less than a reasonable royalty . . . ." The court properly instructed the jury that it could determine damages based either on Chief's lost profits or on a reasonable royalty for the infringing sales.[14]

### A. Chisholm and Mullen Testimony

Chisum sought to prove lost profits by (1) showing Chief's incremental profit per machine sold during the period of infringement by Square Liner and (2) introducing evidence that Chief would have made all the sales made by Square Liner, absent Square Liner's infringement.

To prove profit per unit, Chisum introduced the testimony of Mr. Robert C. Chish-

---

**13.** 35 U.S.C. § 284 provides:

**Damages**

Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed.

The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances.

**14.** The court instructed the jury as follows:

There are two methods that you might use in calculating the amount of damages. One measure of damages is the amount of profits Chief Industries lost due to Square Liner's infringement. The other is the amount of money Chief Industries would have received from Square Liner if Square Liner had been paying a reasonable royalty for the use of the patent in question during the period of infringement.

To be awarded as damages the profits on the sales it would have made, if not for the infringement, the Defendants have the bur-

den of providing the following by a preponderance of the evidence:

(1) that there was a demand for the patented machine;

(2) the number of machines, if any, Chief would have sold, if not for the infringement;

(3) the manufacturing and marketing capability to exploit the demand; and

(4) the amount of profit it would have made.

If you should determine that Defendants have failed to establish any of these elements by a preponderance of the evidence then you shall determine what would have been a reasonable royalty to be paid for a license to use the invention during the period of infringement.

A reasonable royalty is the amount of money that the owner of the patent would accept from someone who is desirous of obtaining a license to use the invention without either party being forced to do so. In other words, a reasonable royalty is the amount which you find that the two free and uncompelled and uncoerced bargainers would agree upon.

In determining reasonable royalty you are entitled to consider any evidence bearing on profits Square Liner may have realized from the infringement as well as any evidence bearing on the amount of money that would have constituted a reasonable royalty during the period of infringement.

olm, comptroller of Chief's Automotive Systems Division, which manufactures and markets Chief's frame straightening machines. Square Liner was not notified that Chisholm would be called until the afternoon before he testified. At trial the next morning, two hours before Chisholm took the stand, counsel for Square Liner received 55 pages of Chisholm's handwritten summaries and calculations allegedly prepared from Chief's annual audited financial statements. Chisholm was allowed to testify, over counsel's objection that his oral testimony was based on incomplete handwritten records which counsel had no opportunity to review. Chisholm indicated during his testimony that he had not brought the audited statements with him. Counsel for Square Liner also objected to subsequent testimony by Mr. Richard J. Mullen, president of Chief's Automotive Systems Division, regarding actual lost profit figures, which he based on Chisholm's testimony.

Rule 1006 of the Federal Rules of Evidence governs the introduction of summaries and calculations from voluminous records. The rule provides:

### Summaries

The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

Chisholm's statement was that his testimony was based on Chief's audited financial statements, but the figures to which he testified were from his handwritten summaries and calculations from those statements.[15] Rule 1006 requires, as a condition precedent to the introduction of summaries

and calculations, that the originals or duplicates of the underlying documents be made available to opposing counsel at a reasonable time and place, and the summaries and calculations are inadmissible if the party who offers them does not make the underlying documentation available prior to their introduction. A party's right to examine underlying documentation and to prepare necessary challenges is not limited by his failure to request such documents during discovery. 5 Weinstein's Evidence ¶¶ 1006[04]–[05] (1978). The belated production to opposing counsel of the handwritten summaries and calculations and the failure to produce or make available the original records or duplicates thereof before Chisholm testified denied Square Liner effective cross-examination. *See Midcontinent Broadcasting Co. v. North Central Airlines, Inc.,* 471 F.2d 357, 359–60 (8th Cir. 1973). We are satisfied that protection of the integrity of Rule 1006 requires its application to Chisholm's oral testimony from his summaries and calculations. *See United States v. Johnson,* 594 F.2d 1253 (9th Cir. 1979).

Accordingly, the court erred in admitting Chisholm's testimony, and counsel's objection to Mullen's lost profit figures, which were based on Chisholm's testimony, was well taken. Such error, however, constitutes reversible error only if it is prejudicial. It is, therefore, necessary to determine the extent, if any, to which Square Liner was prejudiced by the admission of this evidence.

As indicated above, the jury was instructed on both lost profits and reasonable royalty as bases for calculating damages. Because the jury returned a general award of damages, it is impossible to determine which measure of damages it used and whether it relied on Chisholm's and Mullen's testimony in framing the award.[16]

---

15. The handwritten summaries and calculations were not introduced into evidence, and Chisum argues that their use by Chisholm during his testimony was proper under Fed.R.Evid. 612 to refresh his memory. However, the record clearly shows that he testified directly from the summaries and calculations.

16. That the jury award constituted only one-fourth of the total "lost profits" to which Mullen testified is not dispositive of this question. Mullen's figures assumed that Chief would have made every sale made by Square Liner, absent the infringement. The jury could well have determined that Chief would not have

In *Maryland v. Baldwin,* 112 U.S. 490, 5 S.Ct. 278, 28 L.Ed. 822 (1884), defendants filed several pleas, and a general verdict was entered in their behalf. Considering the effect of a possible error, the Supreme Court said:

> On the trial evidence was introduced bearing upon all the issues, and if any one of the pleas was, in the opinion of the jury, sustained, their verdict was properly rendered, but its generality prevents us from perceiving upon which plea they found. If, therefore, upon any one issue error was committed, either in the admission of evidence, or in the charge of the court, the verdict cannot be upheld, for it may be that by that evidence the jury were controlled under the instructions given.

*Id.* at 493, 5 S.Ct. at 279. Because we cannot say with fair assurance that Square Liner was not prejudiced by the evidence in question, the award of damages must be reversed. *E. I. du Pont de Nemours & Co. v. Berkley & Co.,* 620 F.2d 1247, 1257, 205 U.S.P.Q. 1, 8 (8th Cir. 1980) and cases cited; *Conway v. Chemical Leaman Tank Lines, Inc.,* 525 F.2d 927, 929–30 (5th Cir. 1976); *Eichmann v. Dennis,* 347 F.2d 978, 982 (3d Cir. 1965).

### B. Square Liner's Reasonable Royalty Evidence

On the question of reasonable royalty, Square Liner offered its unaudited financial statements for the years 1975, 1977, 1978, 1979, and 1980. The court excluded the records after examining them *in camera* because they were said to contain inaccuracies and inconsistencies. Square Liner then reoffered the documents and offered the testimony of Mr. Michael Reich, a certified public accountant, to explain the inaccuracies and inconsistencies. Mr. Reich's firm did not originally prepare all of Square Liner's financial statements, but "went back and redid the previous accounting and, in fact, made an adjustment that they thought was warranted." The adjusted records were said to have been prepared by Mr. Reich or under his supervision. Chisum made all of Square Liner's sales, and reduced

objected to the introduction of the records and Reich's testimony as irrelevant to the issue of damages, and the court sustained the objection.

■ The jury instructions, *supra* note 14, properly indicated that in determining a reasonable royalty, the jury may "consider any evidence bearing on profits Square Liner may have realized from the infringement ...." *See Zegers v. Zegers, Inc.,* 458 F.2d 726, 728, 173 U.S.P.Q. 385, 387 (7th Cir.), *cert. denied,* 409 U.S. 878, 93 S.Ct. 131, 34 L.Ed.2d 132 (1972). Chisum was incorrect in asserting that the financial statements were irrelevant. Accordingly, the trial court erred to the extent that this evidence was excluded as irrelevant.

Similarly, the court erred in excluding as irrelevant other evidence offered by Square Liner to prove the amount of royalty Chief paid Chisum and the extent of competition in the frame straightening equipment industry. Such evidence is relevant to the questions of reasonable royalty and number of sales Chisum would have made, absent Square Liner's infringement.

### C. Jury Instructions

■ Square Liner argues that the trial court erred in refusing to instruct the jury that a reasonable royalty would leave an infringer with a reasonable profit. However, this is implicit in the court's willing licensor-licensee instruction (*see* note 14, *supra* ), and an explicit recitation of all of the factors that might figure into such hypothetical royalty negotiations was not required.

## IV. PERMANENT INJUNCTION

■ Rule 65(d) of the Federal Rules of Civil Procedure requires that "Every order granting an injunction ... shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained ...." The question raised by Square Liner is whether the injunction entered below satisfies the specificity and description requirements of Rule 65(d).

the award accordingly.

In *E. W. Bliss Co. v. Struthers-Dunn, Inc.*, 408 F.2d 1108, 161 U.S.P.Q. 263, 267 (8th Cir. 1969), this court held that an injunction restraining employees from disclosing trade secrets which would have required the employees to, first, reach the legal conclusion on whether a particular design concept is a trade secret, and, second, test their conclusion in a proceeding to show cause why they should not be held in contempt, was impermissibly vague.

In the present case, the special interrogatory submitted to the jury reads: "Does the Square Liner 360 automobile frame straightening machine infringe one or more claims of Chisum's U. S. Patent No. 3,888,-100?", to which the jury answered "yes." However, there were fifteen claims in the '100 patent and three Square Liner 360 automobile frame straightening machines involved in the litigation. Although we can be fairly certain from the size of the damage award that the machine which accounted for the large majority of Square Liner's sales infringed the patent, we cannot tell whether the other two machines did or did not infringe. Similarly, no guidance is provided by the verdict regarding which claims of the '100 patent were infringed.

Read in its broadest terms, the injunction prohibits Square Liner from indirectly infringing the '100 patent by making, using, or selling any machine having been found to be infringing, and any infringing equivalents thereof. First, Square Liner must refer to another document (the special verdict) to determine which machines have been found to be infringing. Next, because it is not clear whether two of the Square Liner machines infringe, Square Liner must make a judgment of law on this question in order to comply with the injunction. Addi-

tionally, Square Liner must determine whether any new machines it desires to market which have been designed to avoid the '100 patent claims constitute "infringing equivalents" which indirectly infringe the patent. Again, a legal judgment is required, this time involving the complex doctrine of equivalents. Although the wisdom of Square Liner's legal judgments can be tested not only in a future action for infringement but in contempt proceedings, the practical effect of the court's injunction could prevent Square Liner from attempting, in good faith, to design around the '100 patent.

An enjoined party ought not to be compelled to risk a contempt citation unless the proscription is clear. In view of the foregoing, we hold that the injunction does not satisfy the specificity and description requirements of Rule 56(d).[17]

## V. CHISUM'S CROSS APPEAL

### A. Infringement of the '066 Patent

■ Chisum urges that the jury verdict that the '066 patent was not infringed is clearly erroneous, basing his argument on the requirement of a "pedestal" in the claims of the '066 patent.[18] This raises the issue of whether the pivotal attachment, to which the Square Liner pull tower is secured, constitutes a pedestal.

The trial court denied Chisum's motion for judgment NOV on this issue, noting that, although there was evidence that a particular portion of the Square Liner machine could be considered a pedestal, "there was also evidence presented by plaintiff [Square Liner] that the Square Liner device did not infringe the '066 patent because it did not include a pedestal above which the vehicle is supported . . . ." We are satis-

---

17. Although Square Liner's proposed special verdict form would have enabled the court to draft a more specific injunction, the trial judge's failure to adopt Square Liner's form does not, of itself, constitute reversible error.

18. Independent claim 1 is representative:
Apparatus to apply pulling force to a vehicle comprising:
a pedestal above which said vehicle is supported;

at least one vertical pull tower assembly pivotally connected to and movable about said pedestal to a desired position relative to said vehicle, said tower including
means to vertically elongate said tower, and
pull means connectable between said vertically elongate means and a portion of said vehicle to apply said pulling force to said portion.

fied that the jury could have reasonably found, on the evidence presented, that the Square Liner machines lacked the pedestal required by claim 1 and defined in the patent specification.

### B. Treble Damages, Attorneys' Fees, and Prejudgment Interest

Chisum contends that instances of bad faith and willful infringement require that the court treble the damage award. Whether to award treble damages is committed to the discretion of the trial court. *Milgo Electronic Corp. v. United Business Communications, Inc.,* 623 F.2d 645, 665, 206 U.S.P.Q. 481, 497 (10th Cir.), *cert. denied,* 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980). Here the jury concluded that there was not willful infringement. Recognizing that this finding was merely advisory, the court agreed, saying: "The Court, after re-examining the entire record, does not find such elements of bad faith or of a clear showing of deliberate infringement that would justify trebling the jury's damage award." On the record, we are persuaded that the trial court did not abuse its discretion in refusing to award treble damages.

Nor are we persuaded that the trial court abused its discretion in refusing to award prejudgment interest and attorneys' fees.

### VI. DISPOSITION

The judgment of the trial court that the '100 patent was unobvious and not invalid for file wrapper estoppel and recapture, late claiming, and fraud and misconduct is affirmed. The trial court did not abuse its discretion in refusing to declare a mistrial to allow substitution of counsel. The award of damages is vacated and the case is remanded for a new trial on this issue. The order granting the permanent injunction is vacated, without prejudice to Chisum's obtaining an injunction that satisfies the specificity and description requirements of Rule 56(d). We leave to the district court, in the first instance, the decision whether proper findings as to specificity and description can be made on the present record. The jury verdict that the '066 patent was not infringed is sustained. The trial court's order denying treble damages, attorneys' fees, and prejudgment interest is affirmed.