**SATURN MANUFACTURING, INC.,**
**Appellant/Cross-Appellee,**

v.

**WILLIAMS PATENT CRUSHER & PUL-VERIZER CO. and Robert M. Williams,**
**Appellees/Cross-Appellants.**

Nos. 81–2390, 81–2442.

United States Court of Appeals,
Eighth Circuit.

Submitted June 15, 1982.

Decided July 27, 1983.

Klarquist, Sparkman, Campbell, Leigh, Whinston & Dellett, James S. Leigh, Alexander C. Johnson, Jr., Portland, Or., Shepherd, Sandberg & Phoenix, Gerald D. Morris, St. Louis, Mo., for appellant/cross-appellee.

Gravely, Lieder & Woodruff, Frederick M. Woodruff, Lewis, Rice, Tucker, Allen &

Chubb, Mark T. Keaney, St. Louis, Mo., for appellees/cross-appellants.

Before LAY, Chief Judge, JOHN R. GIBSON, Circuit Judge, and FAIRCHILD *, Senior Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

An industrial shear-type shredder for pulverizing metal scrap, tire, and general refuse has spawned this controversy. Saturn Manufacturing, Inc. obtained a patent on the shredder in question and brought this action against Williams Patent Crusher & Pulverizer Company and Robert M. Williams claiming patent infringement and unfair competition concerning Saturn's shredder. The defendants counterclaimed for a declaratory judgment that the patent was invalid and not infringed. A jury returned a verdict for Saturn on the patent validity and infringement issues and found damages in the amount of $115,000. The jury specifically found that Claims 8 and 10 of the Saturn patent were nonobvious and infringed and that the infringement was willful or wanton. The jury found for Williams on the unfair competition claim. Williams appeals contending that the patent is invalid as a matter of law and that file wrapper estoppel applies. Saturn appeals contending that the trial court abused its discretion in denying increased damages, attorney fees, and prejudgment interest for the infringement. We affirm the district court with respect to the validity and infringement issues and the denial of attorney fees.

We reverse and remand on the issues of increased damages and prejudgment interest.

Michael Culbertson and James Keller developed the Saturn shredder during 1974–75. A patent application was filed on August 6, 1975, and patent number 4,034,918 was issued for the Saturn shredder on July 12, 1977. As embodied in Claims 8 and 10, the shredder has a pair of counterrotating cutting shafts with disc-type cutters that are driven by a hydraulic radial piston motor through a gear train, which causes one cutter shaft to rotate at twice the speed of the other. To prevent jamming, a flow-reversing device reverses the cutting shafts for a predetermined time, after which the valve causes the cutter shafts to resume operation in their normal direction.[1]

The Williams Company is engaged in producing such equipment as crushers, pulverizers, shredders, and grinders, and was started about 110 years ago when a hammermill pulverizer was invented by the grandfather of Robert Williams, now President of the Williams Company. Before 1977, Williams had not had a shear-type shredder in its product line. In 1976 a sales engineer for Williams visited Saturn and reported to Robert Williams about the successful shear-type shredder being marketed by Saturn. Robert Williams went to the Saturn plant in Oregon and after his return attempted to get approval of his board of directors to enter into a relationship with Saturn. The board determined not to make

---

\* The Honorable Thomas E. Fairchild, Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit, sitting by designation.

1. The full abstract of the Saturn patent reads as follows:

[The Saturn shredder] has a pair of counterrotating cutting shafts, each of which mounts a series of spaced-apart disc-type cutters. The cutters on one shaft extend into the spaces between cutters on the other shaft so that the cutters on the two shafts coact to shred material fed therebetween. The two shafts are driven by a reversible radial piston hydraulic motor through a gear train arranged to rotate one cutter shaft at twice the speed of the other. The hydraulic motor is driven by an electric motor-driven fixed or variable displacement pump. A flow-reversing valve in the hydraulic motor control circuit controls the direction of fluid flow through the hydraulic motor. The reversing valve is electrically actuated automatically by a fluid pressure-operated switch to reverse flow and the direction of rotation of the cutters to prevent jamming whenever fluid pressure in the motor circuit rises to an abnormally high level. Upon detecting high pressure, the switch energizes a time delay relay which closes a relay contact to energize a solenoid which actuates the flow-reversing valve for a predetermined time period, after which the valve shifts to its normal position to operate the hydraulic motor in its normal directional mode to resume shredding.

such arrangement but a decision was made that Williams would attempt to design and build a similar type shredder. Robert Williams assigned Harold Groves, an engineer with the Williams Company, to develop such a shredder and furnished a brochure and photographs of the Saturn shredder to Groves together with a description of the working of the shredder as he had observed it. In September 1977 Williams marketed the Ripshear, a shredder remarkably similar in appearance and operation to the Saturn shredder.

This action was then commenced and tried to a jury over nine days. The jury returned a special verdict that Claims 8 and 10[2] of the Saturn patent were nonobvious and infringed, that Robert Williams had induced the infringement, and that the infringement and the inducement were willful or wanton. The jury also found Williams not liable for unfair competition. The jury assessed damages in favor of Saturn in the amount of $115,000. The district court entered judgment declaring Claims 8 and 10 of the Saturn patent to be valid, and awarding damages for infringement in the amount assessed by the jury. The court denied Saturn's request for increased damages, attorney fees, and prejudgment interest. This appeal followed.

### I. Patent Validity

The validity of a patent is based on three elements—novelty, utility, and nonobviousness. *Creative Cookware, Inc. v. Northland Aluminum Products, Inc.,* 678 F.2d 746, 747 (8th Cir.1982); *see* 35 U.S.C. §§ 101–103 (1976). Once issued, a patent is presumed valid, 35 U.S.C. § 282 (1976), and the challenging party has the heavy burden of proving invalidity by substantial evidence. *Contico International, Inc. v. Rubbermaid Commercial Products, Inc.,* 665 F.2d 820, 822–23 (8th Cir.1981); *Clark Equipment Co. v. Keller,* 570 F.2d 778, 794–95 (8th Cir.), *cert. denied,* 439 U.S. 825, 99 S.Ct. 96, 58 L.Ed.2d 118 (1978). Williams does not contest novelty or utility. Rather, Williams contends that Claims 8 and 10 of Saturn's patent are invalid because, as a matter of law, the differences between these claims and the prior art are obvious to one skilled in the relevant art.

In *Span-Deck, Inc. v. Fab-Con, Inc.,* 677 F.2d 1237, 1241 (8th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 318, 74 L.Ed.2d 294 (1982), we set forth the standards for determining obviousness as follows:

It is well settled that the question of obviousness is a question of law. *See, e.g., Ralston Purina Co. v. General Foods Corp.,* 442 F.2d 389, 391 (8th Cir.1971). However, as has been often observed, the test for nonobviousness requires several underlying factual inquiries regarding: (1) scope and content of the prior art; (2) differences between the subject patent and the prior art; (3) the level of ordinary skill in the pertinent art at the time

2. Claims 8 and 10 read as follows:

   8. A drive arrangement for a shredding apparatus in which a pair of parallel spaced-apart driven cutter shafts mount coacting counterrotating disc-type cutter elements, said drive arrangement comprising:
   hydraulic fluid-pumping means,
   reversible hydraulic motor means,
   hydraulic fluid circuit means containing said hydraulic pumping means and said hydraulic motor means,
   flow-reversing means for reversing the flow of hydraulic fluid in said hydraulic circuit from said pumping means to said hydraulic motor means,
   electrically operable means for actuating said flow-reversing means including a fluid pressure-operated electrical switch means in an electrical control circuit sensitive to hydraulic pressure in said hydraulic circuit,
   said hydraulic motor means comprising a radial piston hydraulic motor driving said pair of cutter shafts from a common output shaft through a train of gears arranged to rotate one of said shafts in a direction opposite to the direction of rotation of the opposite said shaft and at a rotational speed greater than that of said opposite shaft.
   10. A drive arrangement according to claim 8 including electrically operable time delay means in said electrical control circuit means operable to maintain said flow-reversing means activated and to deactivate said flow-reversing means after a predetermined period of time following actuation thereof.

involved; and (4) certain secondary indicia of nonobviousness such as commercial success, long felt but unsolved needs, and failure of others. *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966); . . . . Because the question of nonobviousness involves both questions of law and fact, it is fundamental that the trial court must make the ultimate conclusion of law by applying the correct legal criteria to the factual determinations made by the jury. *See Swofford v. B & W, Inc.,* 395 F.2d 362, 367–68 (5th Cir.), *cert. denied,* 393 U.S. 935, 89 S.Ct. 296, 21 L.Ed.2d 272 (1968).

Although a special verdict form was used in this case, one of the questions submitted to the jury was whether the differences between the patented subject matter and the prior art were nonobvious, to which the jury answered in the affirmative. Such an answer can be characterized in one of two different ways: either as a finding of what is a question of law, or as what amounts to little more than a general verdict. The jury was instructed as follows with respect to its deliberations on the question of nonobviousness:

> In determining whether or not the invention of the Saturn patent was nonobvious, the primary considerations which you must determine, based upon the evidence you have heard, are as follows:
>
> (i) What is the scope and content of the prior art?
>
> (ii) What are the differences between the prior art and the claims of the Saturn patent which are here asserted by Saturn to be infringed?
>
> (iii) What was the level of skill of a person of ordinary skill in the art of the claimed invention at the time the invention was made?

Our earlier decisions have encountered some difficulty in reviewing jury verdicts on the issue of nonobviousness. In *Span-*

*Deck* Chief Judge Lay observed the differing views of the circuits on such jury findings, some courts upholding the findings if substantial evidence exists to support them, and others, because obviousness is a question of law, engaging in an independent analysis of the underlying facts. In *Span-Deck* Chief Judge Lay concluded that whichever test was used, the result would be the same. In a partial dissent Judge Woods[3] argued that the jury findings should be given greater weight. Judge Arnold in a concurring opinion argued that a case tried to a jury should be reviewed on appeal with the same deference given a jury verdict as in any other kind of case, but concurred in the opinion on the basis that no jury question was made out by the evidence. In *Creative Cookware, Inc. v. Northland Aluminum Products, Inc.,* 678 F.2d 746 (8th Cir.1982), this court speaking through Judge Henley ruled that an attack on the sufficiency of the evidence supporting underlying factual findings on patent validity must be preserved by a motion for directed verdict. In discussing the effect of the jury verdict, Judge Henley stated:

> Although, as stated, obviousness is a question of law, we do not think the trial court erred in submitting underlying fact issues to the jury. *See E.I. du Pont de Nemours & Co. v. Berkley & Co.,* 620 F.2d [1247] at 1264; *Control Components, Inc. v. Valtek, Inc.,* 609 F.2d 763, 767 (5th Cir.), *cert. denied,* 449 U.S. 1022, 101 S.Ct. 589, 66 L.Ed.2d 484 (1980). The jury was instructed that a finding of obviousness must be based on the relevant underlying fact inquiries, and we presume that the jury returned the special verdict on the basis of the instructions given. *See E.I. du Pont de Nemours & Co. v. Berkley & Co.,* 620 F.2d at 1271 n. 44.

*Creative Cookware, Inc. v. Northland Aluminum Products, Inc.,* 678 F.2d at 748 n. 4.

Judge Henley is here discussing a situation similar to this case where a finding of

---

**3.** The Honorable Henry Woods, United States District Judge, Eastern District of Arkansas, sitting by designation.

obviousness is made by the jury based on the fact inquiries submitted in the instruction. His presumption that the verdict is based on the material fact issues in the instructions is a subject on which Chief Judge Lay seemingly agrees in *Span-Deck,* 677 F.2d at 1241 n. 5, citing *Dual Manufacturing & Engineering, Inc. v. Burris Industries, Inc.,* 619 F.2d 660, 667 (7th Cir.) (en banc), *cert. denied,* 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980). In *E.I. du Pont de Nemours & Co. v. Berkley & Co.,* 620 F.2d 1247, 1271 n. 44 (8th Cir.1980), this court faced a similar situation and agreed that a similar presumption applied. With respect to the issue of patent validity, a remand was necessary. Judge Markey,[4] speaking for this court, pointed to the superiority of special verdicts in patent cases, and stated:

> Having resolved the factual inquiries necessitated by the evidence presented to it, the jury at retrial must, if so requested, then reach a final conclusion respecting obviousness.... If that conclusion be accompanied by answers to interrogatories or special verdicts indicating its factual underpinnings, an appeal on the issue may be rendered either unnecessary or more easily managed.

*E.I. du Pont de Nemours & Co. v. Berkley & Co.,* 620 F.2d at 1264 (footnote omitted). Chief Judge Lay, citing *Dual Manufacturing,* agrees in *Span-Deck* that special findings are more desirable in jury cases. 677 F.2d at 1241 n. 5.

With this discussion we can simply conclude that the jury considered the elements outlined in the instruction, the scope and content of the prior art, the differences between the prior art and Claims 8 and 10 of the Saturn patent, and the level of ordinary skill in the pertinent art, in reaching its verdict of nonobviousness. In reviewing this finding, however, as in *Span-Deck,* our analysis of whether there is evidence to support the jury's finding or whether the evidence is such that as a matter of law there is obviousness, as contended by Williams, leads us to the same conclusion.

■ Another preliminary observation is in order. The subject matter of this patent is a combination of known mechanical elements, and therefore we must scrutinize this combination patent "with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements." *Sakraida v. Ag Pro, Inc.,* 425 U.S. 273, 281, 96 S.Ct. 1532, 1537, 47 L.Ed.2d 784 (1976) (citing *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.,* 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950)). In making that examination, the pertinent question is "not whether each element was known or obvious, but whether, considering the invention as a whole, it would have been obvious to combine the elements in the claimed relationship, and a court may look to such evidence of unobviousness as new and advantageous results achieved by the claimed invention, industry acceptance, commercial success, and copying by others." *Square Liner 360°, Inc. v. Chisum,* 691 F.2d 362, 369 (8th Cir.1982).

We find it unnecessary to engage in a separate analysis of "synergism" or whether the combination of elements in the patent produces an effect greater than the sum of the several effects taken separately. Although we made such an analysis in *Reinke Manufacturing Co. v. Sidney Manufacturing Corp.,* 594 F.2d 644, 651 (8th Cir.1979), we deal here, as in *Clark Equipment Co. v. Keller,* 570 F.2d 778, 788–89 (8th Cir.), *cert. denied,* 439 U.S. 825, 99 S.Ct. 96, 58 L.Ed.2d 118 (1978), with a combination of elements that are far more complex than the basic and simple elements combined in *Reinke.* Moreover, we believe that synergism is more properly considered a phenomenon that is indigenous, if not peculiar, to chemistry and physiology, rather than to mechanics as involved here. *See generally* P.

---

4. The Honorable Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, sitting by designation.

Rosenberg, *Patent Law Fundamentals* § 9.04[3] (1980).

## A. Scope and Content of the Prior Art

The parties differ on what is the relevant prior art for the determination of nonobviousness, with Williams arguing that hydraulic art is involved, and Saturn that shredder art is involved. It suffices to say that Williams requested an instruction, which was given, that shredder art was the relevant art. Williams cannot now be heard to object.

Evidence was presented on several items of prior art. Although there was testimony on the Clar, Schwarz, and Erickson patents,[5] the Teledyne and Cunningham shredders appear to be the most relevant.

The Teledyne shredder was developed by Bob Donovan, the founder of Saturn, in 1972, and was sold by Saturn in February, 1974. The Teledyne shredder utilizes a high RPM electric motor to drive a pump which in turn drives a high RPM hydraulic motor. Two cutter shafts, one driven at twice the speed of the other, counterrotate through speed-reducing gears.

The Cunningham shredder was developed for the Coats Company as a tire shredder. The Cunningham shredder utilizes a high RPM electric motor to drive a reversible pump. The pump turns two low RPM reversible hydraulic motors which operate separate cutter shafts rotating at the same speed both in forward and reverse modes. There is also an electric reversal feature.

## B. Differences Between the Prior Art and Claims 8 and 10 of the Saturn Patent

Williams argues that the Teledyne shredder differed from the Saturn shredder in only two features: (1) the automatic reversing in Teledyne was hydraulically (not electrically) activated; and (2) a vane (not radial piston) hydraulic motor was used. We disagree. Other differences were that the Teledyne shredder (1) sensed a jamming condition hydraulically, not electrically; (2) had an automatic reversing which was not electrically timed; (3) required a high-ratio speed-reducing drive from the hydraulic motor similar to that of the Schwarz patent; and (4) was limited in size to under fifty horsepower because larger machines of that design would strip gears.

Williams further argues that the Cunningham shredder contained all the elements of the Saturn patent except that it had a direct drive on the shafts using two hydraulic motors, one on each shaft, and therefore did not use or need the gear train found in Saturn's shredder. Saturn argues, and we agree, that the Cunningham shredder also differed from the Saturn shredder in that (1) it had a hydraulic fluid circuit arranged to turn the cutter shafts at the same speed, not different speeds, during both shredding and reversal; and (2) it did not disclose the use of a radial piston motor, but required the use of another patent to make this claimed combination. The record also shows that of the seven Cunningham shredders which were produced, six were field-tested and none was sold. Cunningham testified that there were problems with the cutters and shaft design, and that the price was escalating beyond what he felt would make it possible to sell the machines in volume situations.

Finally, Williams argues that if the single hydraulic motor and gear train in the Tele-

---

**5.** The Clar patent is a hydraulic trash compactor in which a reversible hydraulic ram is supplied with hydraulic fluid by an electric motor driven pump. A two-position flow-reversing control valve is in the hydraulic lines. A valve is moved one position by energizing a solenoid and is moved to the other by a return spring. A switch responsive to pressure in a hydraulic circuit energizes the solenoid when pressure in the circuit rises to a jam and the valve then reverses the hydraulic flow.

The Schwarz patent discloses a shredder with a high RPM electric motor, which utilizes a speed-reducing transmission to drive two counterrotating cutter shafts, one rotating at twice the speed of the other.

The Erickson patent, involving a massage suit, demonstrates a reciprocating piston through a reversing valve which the solenoid operates by means of pressure switches. Although the Erickson patent was before the patent examiner and the Clar patent was not, it is apparent that these two patents were so similar that the Clar patent would have been redundant.

dyne shredder is combined with the electrically activated flow reversal and radial piston hydraulic motor of Cunningham, there are no differences in these two combined prior art items from what is shown in Saturn's Claims 8 and 10. This is essentially an argument based on hindsight. We agree with Saturn's argument that the use of Teledyne's high-speed motor and high-reduction gear train runs contrary to the recommendation of the Cunningham patent. There was evidence that the Cunningham patent teaches away from using a single-motor gear-drive arrangement. It is also evident that Cunningham, while attempting to develop his shredder, was aware of the Saturn shredder and also knew of an all-electric shredder of the type in the Schwarz patent, but nonetheless did not achieve the combination contained in Claims 8 and 10 or some satisfactory alternative. The differences between Claims 8 and 10 and the prior art may be subtle and slight in hindsight, but they were the differences between success and failure.

## C. Level Of Ordinary Skill In The Pertinent Art

The parties do not seriously contest the level of ordinary skill in the shredder art at the time the invention was made. Based on the trial testimony as a whole, it is safe to conclude that this level of ordinary skill in the shredder art would involve a high school education with some practical experience, or an engineering degree with no experience. It appears that those who were engaged in the relevant art during 1974–75 were at or above the level of ordinary skill but nonetheless were unable to solve the problems of unpredictable reversal and gearstripping that beset shredders at that time. Harold Groves, who was with the Williams Company and was assigned to design the Williams shredder, stated that when the shredder project was assigned to him he had four or five years of experience designing shredder equipment but that it was still a "black art" to him. Mr. Cunningham worked from August 1973 until mid-1975 as a senior project engineer at the Coats Company to design a tire shredder, but the Cunningham shredder project was a commercial failure and of limited reliability. Finally, Bob Donovan, who had developed the Teledyne shredder, was an engineer with at least two years of experience in designing shear-type shredders, but was unable to solve the various technical problems presented.

## D. Secondary Indicia of Nonobviousness

In *Graham v. John Deere Co. of Kansas City,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966), the Supreme Court made it clear that such secondary considerations as "commercial success, long felt but unsolved needs, failure of others, etc." may have relevancy as "indicia of obviousness or nonobviousness." Citing Judge Learned Hand's opinion in *Reiner v. I. Leon Co.,* 285 F.2d 501, 504 (2d Cir.1960), the Court stated that these subtests are "more susceptible of judicial treatment than are the highly technical facts often present in patent litigation." 383 U.S. at 36, 86 S.Ct. at 703. These factors assist the judiciary and serve to "guard against slipping into use of hindsight." *Id.* (quoting *Monroe Auto Equipment Co. v. Hecketthorn Manufacturing & Supply Co.,* 332 F.2d 406, 412 (6th Cir.1964)).

Prior to the development of the Saturn shredder, the record shows a long unsolved need for a large industrial shear-type shredder. Shredding of industrial waste, such as scrap metal and heavy trash, was done in hammermills, but hammermills were uneconomical unless large volumes of materials were to be shredded, and they had great difficulty in shredding certain types of refuse such as wire cable, carpeting, cloth, and plastic. The shear-type shredders that were available were typically driven by small electric motors through speed-reduction gears. The motors in these shredders, however, would tend to burn out when subjected to sudden excessive torque demands due to jamming and repeated reversals. Repeated reversals also would place excessive stress on the shredders' mechanical

drive components, leading to premature failure of cutter teeth and shafts.

After the Saturn shredder was introduced, there is no doubt that it attained commercial success. Saturn's sales increased from $70,000–$120,000 in 1973–74 to approximately $3.5 million in 1980. As of the time of trial, Saturn had sold about 100 patented shredders in about a half dozen countries. Saturn's shredder has been the subject of trade journal articles, and several hammermill manufacturers have quoted Saturn shredders to their customers.

A further consideration of nonobviousness is Williams' careful and close copying of the Saturn shredder. *See Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co.,* 220 U.S. 428, 441, 31 S.Ct. 444, 450, 55 L.Ed. 527 (1911); *Square Liner 360°, Inc. v. Chisum,* 691 F.2d at 369. Robert Williams testified that the Saturn shredder was the best state of the art and that his company desired to design a machine that would be superior to the Saturn machine. The testimony was clear that Robert Williams assigned the project to Harold Groves to design a machine similar to Saturn. Robert Williams had a Saturn brochure in his hand when he told his engineering department that he would like to design the hydraulic type shredder. Groves used a group of photographs of the Saturn shredder as a guide, photographs which were taken by Robert Williams at a trade show after the show had closed for the day and when no one else was in the show area. Testimony made abundantly clear that the Williams machine was a copy of the Saturn shredder. It had a radial piston motor and a reversing mechanism that would automatically reverse the cutter shafts for clearing jams. The cutter shafts operated at different speeds, one at 60 RPM and the other at 40 RPM, and the different speeds were obtained through the use of a gear box. The Saturn brochure was used as a guide.

### E.   Conclusion As To Nonobviousness

■   The record amply demonstrates that the Saturn invention achieved new and advantageous results over prior shredders, and that it involved substantial questions of problem recognition, element selection, and element combination. The invention met an unsolved need for a large industrial shear-type shredder, and achieved industry acceptance and commercial success whereas others failed. The record also demonstrates that the infringing Williams machine carefully and closely copied the Saturn shredder. Therefore, we hold that Claims 8 and 10 of the Saturn patent would not have been obvious to a person of ordinary skill in the art at the time the invention was made.

### II.   Infringement

Williams argues that the Williams shredder does not infringe Claims 8 or 10 of the Saturn patent by reason of "file wrapper estoppel by admission." Williams argues that the patent attorney prosecuting the Saturn application made a representation to the Patent and Trademark Office that the scope of the element, "flow reversing means," in Claim 1 was limited to no more than a two-position two-way valve with one solenoid. In view of this representation, Williams argues that Saturn is now estopped from claiming that a similar phrase in Claim 8 encompasses the four-way, three-position valve with two solenoids admittedly employed by Williams.

■   File wrapper estoppel by admission is an extension of classic file wrapper estoppel.[6] It refers to the situation where a patentee has deliberately argued a narrow construction for a patent claim before the Patent and Trademark Office to overcome a rejection and obtain a patent, and is thereafter precluded from arguing a broader construction of the claim for infringe-

---

6.   Classic file wrapper estoppel pertains to the actual amendments of claims that are made to induce the granting of a patent. *See Coleco Industries, Inc. v. United States International*

*Trade Commission,* 573 F.2d 1247, 1257 (C.C.P. A.1978); *Duplan Corp. v. Deering Milliken, Inc.,* 379 F.Supp. 388, 392–93 (D.S.C.1974).

ment purposes. *See Coleco Industries, Inc. v. United States International Trade Commission,* 573 F.2d 1247, 1257–58 (C.C.P.A. 1978). Like classic file wrapper estoppel, file wrapper estoppel by admission applies to limit the application of the doctrine of equivalents,[7] under which a claim that does not literally read on an accused device may still be infringed thereby if the accused device "performs substantially the same function in substantially the same way to obtain the same result." *Square Liner 360°, Inc. v. Chisum,* 691 F.2d 362, 370 (8th Cir.1982) (quoting *Graver Tank & Manufacturing Co. v. Linde Air Products Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950)). In the present case, the jury was instructed that it could find infringement of the Saturn patent claims on the basis of either literal infringement or infringement under the doctrine of equivalents. In its verdict the jury found both Claims 8 and 10 of the Saturn patent to be infringed. Although the jury did not specify the type of infringement, it is our conclusion, upon carefully examining the record, that literal infringement could readily have been found.[8] Thus, we do not believe it necessary to address the question of file wrapper estoppel. Even if we were to do so, however, we would not find the doctrine to be applicable since the statement upon which Williams relies was directed at most

to amended application Claims 1, 2, and 3, which are not in issue, and not to patent Claims 8 and 10. Accordingly, we affirm the ruling of the district court denying Williams' motion for judgment notwithstanding the verdict on the file wrapper estoppel issue.

### III. Evidentiary Rulings

██ Williams argues that the district court erred in making several evidentiary rulings, entitling them to a new trial. Williams first contends that the trial court erred in overruling Williams' objection to showing to the jury movies of the accused shredder and of a commercial device marketed by Saturn. Motion pictures of commercial devices are admissible to aid the jury in understanding the language of patent claims provided they are properly authenticated and are shown to have been made in substantial compliance with the teachings and claims of the patent alleged to be infringed. *See Hartford-Empire Co. v. Obear-Nester Glass Co.,* 39 F.2d 769, 771 (8th Cir.1930); *McCormick's Handbook of the Law of Evidence* § 214, at 533–34 (2d ed. 1972). The determination of these preliminary questions is left to the broad discretion of the trial court and will not be reversed unless it is "manifestly erroneous" and a clear abuse of discretion. *See Holmgren v. Massey-Ferguson, Inc.,* 516 F.2d 856, 858 (8th Cir.1975).

---

**7.** *See National Research Development Corp. v. Great Lakes Carbon Corp.,* 410 F.Supp. 1108, 1119–20 (D.Del.1975).

**8.** Williams' argument that, having shown a two-position, single-solenoid valve in the patent drawing and identified it in the specification as a "flow-reversing means," Saturn should be so limited in all of its claims, is without merit. In *Autogiro Co. of America v. United States,* 384 F.2d 391, 398 (Ct.Cl.1967), the Court of Claims stated:

> The specification "set[s] forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112. This one embodiment of the invention does not restrict the claims. Claim interpretation must not make use of "best mode" terms inasmuch as the patentee need not guard against infringement by listing every possible infringing device in the specification. [Citations omitted.]

That "flow-reversing means" is not intended to be limited to the specific valves shown and

described in the patent is clear from the last paragraph of the patent specification preceding the claims, in which it is stated that the description is only a "preferred embodiment of [the] invention" and that "the preferred embodiment may be modified in arrangement and detail without departing from the principles of the invention which are intended to be illustrated but not limited by the disclosure."

We also observe that "flow-reversing means" is defined both broadly and narrowly in the different Saturn patent claims. Unlike other claims which contain narrower definitions of "flow-reversing means," the term is very broadly defined in Claim 8 as simply "flow-reversing means." Only Claim 6, not in issue, defines the flow-reversing means almost as narrowly as Williams would have it defined in all claims. The Williams' argument is untenable because it would render meaningless the various differences in definition of "flow-reversing means" in different Saturn patent claims.

■ Saturn laid an adequate foundation for the movies in question. Dan Burda, who was present at the making of both movies, testified that the Saturn shredder movie was a true and accurate representation of the Saturn shredder he observed, that the shredder depicted was manufactured and sold by Saturn in 1976, and that the shredder had all the features shown in Claims 8 and 10 of the Saturn patent. Burda further testified that the Williams shredder movie was a true and accurate representation of the shredder he had observed at the Williams Company, that the shredder was a comparably sized machine to the one depicted in the Saturn shredder movie, and that the various components of the Williams shredder were covered in the Saturn patent. Based on this showing, the district court did not abuse its discretion in admitting the two movies.

■ Williams next contends that the district court erred in sustaining Saturn's objection to the admission of the movie of the Cunningham shredder. Williams argues that the movie was relevant to the issue of obviousness and that Williams did not learn of the existence of the movie until the day before Mr. Cunningham's court appearance. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Fed.R.Evid. 403. It is evident that the movie was first discovered during the second week of trial and thus there was no adequate opportunity for the opposing side to conduct an investigation. The district court excluded the movie, observing that "there must be some point at which we get too deep into the ambush." We agree that the movie posed a substantial danger of prejudice, and accordingly find no abuse of discretion in its exclusion.

■ Williams' final contention is that the trial court erred in denying Williams' second motion in limine and overruling Williams' objections to the testimony of Vern Burda and John Howell regarding Saturn's lost profits because lost profits were never

pleaded as special damages under Fed.R. Civ.P. 9(g). We disagree. In a patent infringement action, the patentee's lost profits are not special damages but are one of the possible elements of "damages adequate to compensate for the infringement" under 35 U.S.C. § 284. *See Milgo Electronic Corp. v. United Business Communications, Inc.,* 623 F.2d 645, 663 (10th Cir.) (per curiam), *cert denied,* 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980); *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152, 1156 (6th Cir.1978). Therefore, special pleading under Fed.R.Civ.P. 9(g) was not required.

### IV. Saturn's Appeal

■ The district court denied Saturn's request for prejudgment interest observing that prejudgment interest under 35 U.S.C. § 284 (1976) was to be awarded in the discretion of the court and that the general rule was that interest should be awarded from the date damages are determined. We need not determine whether the district court's conclusion at the time this case was tried was based on valid reasons. The Supreme Court in *General Motors Corp. v. Devex Corp.,* — U.S. —, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983), held that prejudgment interest ordinarily should be awarded under 35 U.S.C. § 284 absent some justification for withholding such an award. The Court reasoned that prejudgment interest is necessary to ensure that the "patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement. An award of interest from the time that the royalty payments would have been received merely serves to make the patent owner whole .…" *Id.* at —, 103 S.Ct. at 2062–63 (footnote omitted). It is evident that the district court did not approach the question of prejudgment interest under the principles laid down in the later *Devex* case, and we feel it appropriate to remand this issue to the district court for further consideration under the standards announced in *Devex.*[9]

9. September 1977 is the date of completion of the infringing shredder and under *Devex* may

be the time from which prejudgment interest would run. In addition, since prejudgment in-

1358

■ The district court also denied Saturn's requests to increase the damages awarded by the jury and to award attorney fees. The court recognized that 35 U.S.C. § 284 (1976) authorized it to "increase the damages up to three times the amount found" and that 35 U.S.C. § 285 (1976) authorized it to award attorney fees in "exceptional cases." The court concluded: "Defendants' conduct, in the opinion of the Court, was neither egregious nor taken in bad faith. Plaintiff's proposed judgment for treble damages and attorney's fees, therefore, will not be entered." In so concluding, as it did with respect to prejudgment interest, the district court apparently considered exceptional circumstances to be required to justify an award of increased damages. Here the jury found willful or wanton infringement of the Saturn patent, and this ordinarily is sufficient to support an award of increased damages. *See Milgo Electronic Corp. v. United Business Communications, Inc.,* 623 F.2d 645, 666 (10th Cir.) (per curiam), *cert. denied,* 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980); *General Electric Co. v. Sciaky Bros.,* 415 F.2d 1068, 1071–74 (6th Cir.1969). It appears that the district court imposed a higher standard, the exceptional circumstances standard, in denying increased damages. Although an award of increased damages is discretionary under the statute and the decided cases, nonetheless in view of the analysis in *Devex* that section 284 does not incorporate the exceptional circumstances standard of section 285, *see* —— U.S. at ——, 103 S.Ct. at 2061, we feel it appropriate to remand this issue to the district court for further consideration in light of *Devex.*

■ The findings of the district court fully support its conclusion that this is not such an exceptional case as to justify an award of attorney fees.

### V. Conclusion

Accordingly, we affirm the judgment declaring Claims 8 and 10 of the Saturn patent to be valid and awarding damages for the infringement. We also affirm the denial of Saturn's request for attorney fees. We remand the issues of prejudgment interest and increased damages to the district court for further consideration in light of *Devex.*

APPENDIX

U.S. Patent    July 12, 1977                4,034,918

FIG. 1

terest serves to make the patent owner whole and to compensate him for the foregone use of his money between the time of infringement and the date of judgment, *see Devex,* —— U.S. at ——, 103 S.Ct. at 2062, an appropriate rate of interest would be the prevailing market rate.

FIG. 3

FIG. 2

Key to Drawings

FIG. 1

| 50 | Electrical Control Panel |
| 52 | Electric Motor |
| 54 | Output Shaft |
| 56 | Shaft Coupling |
| 58 | Input Shaft |
| 60 | Hydraulic Fluid Pumping Means |
| 68 | Fixed Displacement Servo Pump |
| 48 | Hydraulic Tank |
| 46 | Support Table |
| 62 | Hydraulic Supply and Return Hoses |
| 26 | Radial Piston Hydraulic Motor |
| 28 | Transmission Housing |
| 10 | Hopper |
| 12 | Shredder Housing |
| 14 | Support Frame |
| 16 | Legs |
| 18 | Belt Conveyor for Receiving Shredded Material |

FIG. 2

| 10 | Hopper |
| 26 | Radial Piston Hydraulic Motor |
| 28 | Transmission Housing |

FIG. 3

| | |
|---|---|
| 26 | Radial Piston Hydraulic Motor |
| 28 | Transmission Housing |
| 30 | Gear Train |
| 32 | Output Shaft of Motor |
| 34, 36, 40, 42 | Gears |
| 38, 44 | Cutter Shaft Extensions |
| 10 | Hopper |
| 12 | Shredder Housing |
| 24 | Disc-Type Cutter Elements |
| 24a | Peripheral Shredding Teeth |
| 20, 22 | Cutter Shafts |