711 F.Supp. 970 (1988)
H.H. ROBERTSON COMPANY, Plaintiff,
v.
MAC-FAB PRODUCTS, INC., Defendant.
No. 85-2687 C (5).
United States District Court, E.D. Missouri, E.D.
May 20, 1988.
*971 Ernest E. Figari, Jr., Johnson & Swanson, Dallas, Tex., Arland T. Stein, Frederick H. Cohen and James G. Uber, Reed Smith Shaw & McClay, Pittsburgh, Pa., Robert M. Lucy, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for H.H. Robertson Co.
Edward A. Boeschenstein and Frederick M. Woodruff, Gravely, Lieder & Woodruff, Jason M. Rugo and J. Bennett Clark, St. Louis, Mo., for Mac-Fab Products, Inc.

MEMORANDUM
LIMBAUGH, District Judge.
This civil action concerns United States Patent No. 3,721,051 originally issued to *972 Frank Fork, and assigned to plaintiff H.H. Robertson Company. Robertson contends that defendant Mac-Fab Products, Inc. has infringed the Fork 051 Patent by inducement under 35 U.S.C. § 271(b) and has contributorily infringed the patent under 35 U.S.C. § 271(c). Plaintiff seeks declaratory and injunctive relief as well as an award of damages. In its answer and counterclaim, defendant Mac-Fab raises an affirmative defense to plaintiff's claim, contending that the Fork 051 Patent is invalid. Defendant further claims that it did not induce any other entity to infringe the plaintiff's patent and that it did not contribute to any infringement. Finally, Mac-Fab claims that the plaintiff's inequitable conduct in failing to apprise the Patent Office of the existence of pertinent prior art and in encouraging Mac-Fab to produce a product which it now contends violates the Fork 051 Patent should preclude plaintiff from prevailing in this action.

I. Procedural issues.

The parties tried this cause to the Court on the issue of liability with the understanding that the issue of damages would be tried separately if plaintiff Robertson prevailed in the initial proceeding. Subsequent to the trial, the parties submitted proposed findings of fact and conclusions of law and memoranda for the Court's benefit.
Plaintiff has filed three motions to expand the trial record before the Court. In the first motion, plaintiff requests the admission into evidence of Exhibit 421, a catalog of Butler Manufacturing, Inc., and Exhibit 422, a license agreement executed by Butler and plaintiff Robertson. As defendant correctly notes, plaintiff has produced no evidence to support the admission of these items, and standing alone they constitute inadmissible hearsay evidence. However, in the second and third motions to enlarge the trial record, plaintiff seeks the admission of exhibits 423-27, which are court orders and other portions of the court records in cases concerning issues similar to those before the Court here. The Court will take judicial notice of the court orders (Exhibits 423, 425, 426 and 427) and admit them into evidence. The record in support of the court order in the Bargar case is hearsay and will not be admitted.

II. Findings of Fact.

Plaintiff H.H. Robertson Company is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania. Robertson manufactures and sells a wide variety of products, including a number of different electrification systems for high-rise buildings. Plaintiff Robertson is the assignee of all rights incident to the Fork 051 Patent which was granted to Frank Fork in 1968. Defendant Mac-Fab, a Missouri corporation with its principal place of business in St. Louis, Missouri competes in essentially the same market for electrification systems.
Builders have searched for several decades for effective and cost efficient ways to distribute wiring throughout the various floors of office buildings. The floors in these buildings have generally consisted of a layer of concrete over a corrugated metal subfloor spanning between I-beams. This metal subfloor has consisted of enclosed cells running parallel to the crests and troughs in the corrugated flooring for distribution of wiring to various points in the floor. However, gaining access to these cells has been a difficult problem.
The earliest systems provided for the distribution of electrical, telephone and other wiring to the metal cellular units through separate header ducts lying across the crests of the metal subfloor and embedded in a layer of concrete which covered the other portions of the subfloor. Whenever a tenant sought to have one of the services delivered to a specific point in a floor, he hired someone to break a hole through the concrete layer into the top of the appropriate header duct. The installer then cut a second hole through the bottom of the header duct, and then a third hole through the crest of the cell through which the service ran. This system was very unwieldy because it required considerable time and expense. Also, over time, this system left the floor in an unsightly condition, *973 with abandoned access holes quite apparent to the eye.
In 1961, the infloor electrification industry began using underfloor electrical cable trench. This type of system employed a removable top that was flush with the floor surface of the concrete layer. It used a trench which was installed across the crests of the metal subflooring. However, the electrical cable trench, while an improvement over the olderheader duct systems, still presented major problems. The trench itself consisted of a U-shaped base pan. Access from the trench into the adjacent underlying cells in the metal subflooring still required the cutting of two access openings at the building site, one in the bottom of the trench and one in the crest of the cell in the subfloor.
As the cells in the subflooring were hidden from viewcovered by the full-bottomed trench and the concrete layerthe structure of the full bottomed trench created what persons in the industry have termed a "blind condition." It was difficult to locate the cells which occurred only at intervals throughout the flooring. In addition, even when the contractor carefully recorded the location of the cells, gaining access to those cells still required substantial expense as an electrician had to drill a hole through the bottom of the trench and then through the top of the underlying cell. This type of full-bottomed trench system also required the maintenance of large inventories of various sized trenches and other components, increasing its cost.
Frank W. Fork proposed a solution to the various problems endemic to the technology available in the late 1960s in the form of an invention which later became known as the "bottomless trench." He proposed a method of delivering services throughout the floors of high-rise buildings by way of a trench composed of a number of separate components. In the Fork 051 invention, as described in the patent, two sides combine with the metal subflooring and a removable top to create what is, in effect, a trench. Because the trench has no bottom apart from the subflooring, the cells in the subfloor are visible and gaining access is relatively easy. The Fork 051 consists of one independent claim and fifteen dependent claims. These claims are included in their entirety in the Appendix to this decision.
In proposing this invention, Fork acted contrary to the conventional belief that a trench without a bottom separate from the metal subflooring would satisfy safety standards. Further, industry experts were extremely skeptical of the feasibility of the Fork 051. However, Robertson allayed these fears, and the bottomless trench concept now represents one of the industry standards and has been highly successful.
Mac-Fab began selling the trench assembly which plaintiff Robertson contends violates the Fork 051 Patent in 1980. In its first job, Mac-Fab purchased trench components from Bargar, Inc., and resold them along with its own sub-flooring including metal cellular units for the GTE Building in Tampa, Florida. The trench system installed in the GTE Building employed horizontal closures, but did not have a bottom in the traditional sense. Mac-Fab then sold similar systems for fifteen buildings. The evidence at trial suggests that Mac-Fab designed the electrification distribution systems for these jobs and made the component parts they required. Defendant also directed the installation of the electrification systems at the job sites.
The Mac-Fab "intermittent bottomless trench" has a metal subfloor and an overlying layer of concrete. The metal subfloor presents alternating crests and troughs and includes metal cellular units providing generally parallel enclosed cells. There is also a subassembly which is comprised of opposite sides independently anchored in the concrete layer in fixed spaced-apart relationship and a cover plate spanning the distance between the opposite sides. The subassembly transverses across the alternating crests and troughs in the sub-flooring. The Mac-Fab intermittent bottomless trench also has adjustable side rails, a power compartment forming an enclosed raceway extending downwardly from the cover plate between the side rails.
In the regions of the cells, the Mac-Fab intermittent bottomless trench has no bottom. *974 However, the intermittent trench does have horizontal closures over those portions of the sub-assembly comprised of the alternating crests and troughs, as opposed to those portions in the vicinity of the cells. Defendant Mac-Fab contends that the existence of the horizontal closures suggests that its intermittent bottomless trench is no more than the Canadian 866 patent with pre-punched holes in the bottom in the vicinity of the cells. Because the Canadian 866 patent was in the prior art, defendant asserts, the Mac-Fab intermittent bottomless trench, its functional equivalent, does not violate the Fork 051 Patent.
The plaintiff contends that the intermittent bottomless trench violates the Fork 051 Patent because the language of the patent clearly contemplates the use of horizontal closures in areas of the trench where there are no cells. What matters, plaintiff Robertson contends, is that the portions of the Mac-Fab trench which are directly over the cells in the underlying sub-flooring have no bottom. This absence of a bottom in the Mac-Fab intermittent bottomless trench is the key factor on which Robertson relies in contending that the defendant's products infringe the Fork 051 Patent.
Mac-Fab installed an electrified floor structure on the first floor of the J.C. Penney building in Plano, Texas which does not employ the use of metal subflooring constituting alternating crests and troughs. Rather, the cells used for the distribution of services throughout the flooring rest on a concrete slab, rather than the metal sub-flooring used in the upper floors in that same building. However, as in the other products sold by Mac-Fab which plaintiff contends infringe the Fork 051 Patent, the first floor system has an access trench which has no bottom in the areas where it passes over the distribution cells. In the other areas of the trench, through, Mac-Fab employed horizontal closures to preclude concrete from penetrating into the trench.

III. Conclusions of Law.

The Court has subject matter jurisdiction over this patent suit pursuant to 28 U.S.C. § 1338(a). The Court will first decide whether the Fork 051 Patent is valid, and will then determine whether the products designed and sold by Mac-Fab infringe the Fork patent. In the remaining portions of this opinion, the Court will examine several collateral issues raised by the parties.

A. Validity.

A patent is presumed valid, and the challenging party has the burden of proving its invalidity. 35 U.S.C. § 282; Atlas Powder Co. v. E.I. duPont de Nemours & Co., 750 F.2d 1569, 1573 (Fed.Cir.1984); Saturn Mfg. v. Williams Patent Crusher, 713 F.2d 1347, 1350 (8th Cir.1983). This burden is a heavy one, and must be met with clear and convincing evidence. Atlas Powder, 750 F.2d at 1573.
1. Effect of Prior Decisions. In asserting that the Fork 051 Patent satisfies the statutory requirements of patentability, Robertson not only relies on the cited statutory presumption, but also notes that two different district courts have found the Fork 051 Patent valid. See H.H. Robertson Company v. Bargar Metal Fabricating Co., Cause No. C80-1166, 225 U.S.P.Q. 1191, 1984 WL 1849 (N.D.Ohio 1984) and H.H. Robertson Company v. United Steel Deck, Cause No. 84-5357 slip op. (D.N.J. March 31, 1986). Robertson claims that the findings of validity in these two decisions should receive issue preclusion effect here, even though Mac-Fab did not participate in the earlier proceedings.
In support of its contention, Robertson cites a line of authority arising from the Seventh Circuit's decision in Mercantile National Bank of Chicago v. Howmet, 524 F.2d 1031, 1032 (7th Cir.1975), cert. denied, 424 U.S. 957, 96 S.Ct. 1435, 47 L.Ed.2d 364 (1976). Essentially, these decisions hold that because patent cases are very complicated, principles limiting the use of offensive collateral estoppel should not apply. This view does not have universal approval though. The Second Circuit has taken a different approach applying a *975 standard collateral estoppel approach. See e.g. Champion Spark Plug Co. v. Gyromat Corp., 603 F.2d 361, 367 n. 12 (2d Cir.1979), citing Jamesbury Corp. v. Litton Industrial Products, 586 F.2d 917, 921 n. 9 (2d Cir.1978). A party who wins in an initial action ordinarily cannot use offensive collateral estoppel against a party that did not participate in that action or is not in privity with an original party. See 18 C. Wright, A Miller & M. Cooper, Federal Practice and Procedure §§ 4448 and 4449. If ordinary principles apply, plaintiff Robertson cannot assert that Mac-Fab is collaterally estopped from denying the validity of the Fork 051 Patent.
Although the plaintiff cites the case of Atlas Powder Co. v. Ireco Chemicals, 773 F.2d 1230 (Fed.Cir.1985), for the proposition that the Federal Circuit has adopted and broadened the expansive rule of the Seventh Circuit, the cited proposition was not before the court there. Id. at 1232. Rather, the Federal Circuit merely held that the existence of prior adjudications of validity has relevance to the issue of the probability of success on the merits, which an applicant for preliminary injunctive relief must establish. Id.
The Court agrees that patent litigation is cumbersome and that the rule urged by Robertson and the Seventh Circuit would tend to lessen the cost of subsequent suits by a patent holder once a court has found the patent valid in an initial suit. However, the efficiencies gained are no greater in the patent context than in complex cases generally, and the Court can imagine no reason why courts should single out patent cases as a class exempt from the operation of the rules and principles of issue and claim preclusion. The plaintiff has the benefit of the operation of the statutory presumption of validity, and application of the additional presumption urged by Robertson would serve little purpose. Consequently, while the Court will accord the Fork 051 the presumption of validity, it bases this presumption on the statute, 35 U.S.C. § 282, not the earlier district court cases.
2. Statutory Requirements. Mac-Fab must prove that the bottomless trench failed to meet one of the requisites of patentability, i.e. novelty, utility or nonobviousness. Saturn Mfg., 713 F.2d at 1350. The defendant essentially concedes that the Fork 051 Patent has utility, and focuses his attack on the issues of novelty and nonobviousness.
a. Novelty. Mac-Fab can establish the defense of lack of novelty, i.e. "anticipation," only by proving the existence of "a single prior art reference which discloses each and every element of the claimed invention." Structural Rubber Products v. Park Rubber, 749 F.2d 707, 715 (Fed.Cir. 1984), citing, RCA v. Applied Digital Data Systems, 730 F.2d 1440, 1444 (Fed.Cir. 1984); see also 35 U.S.C. § 103 and Kistler Instrument A.G. v. United States, 628 F.2d 1303, 1311 (Ct.Cl.1980) ("The test for determining if a reference anticipates a claim of a patent is whether the reference contains within its four corners adequate directions for the practice of patent claim.").
The Ford bottomless trench consists of a trench sub-assembly with two opposing sides which creates an under-floor trench spanned by a coverplate, surrounded by a layer of concrete overlying metal subflooring consisting of alternating crests and troughs. The sub-assembly has no bottom in the traditional sense and the metal decking serves, at least in part, as the trench bottom. This invention eliminated a number of problems inherent in electrified flooring distribution systems, including the "blind condition" and the cost of maintaining extensive inventories.
The Court has carefully examined all of the prior art references cited by the defendant and finds that no one reference contains all of the elements of the Fork 051 bottomless trench. Mac-Fab's most ardent argument concerns the "Weissman" Patent, U.S. Patent No. 3,680,775. However, the Weissman Patent, even after its remarkable interpretation by defendant's expert, does not contain the same elements as the Fork 051 Patent. The Weissman Patent does not depict a means of electrical service distribution that is flush with the remaining portions of the floor. The system *976 described by the Weissman Patent does not consist of a combination of essentially interchangeable parts, and provides for the distribution of electrical power only, while the Fork 051 Patent provides for the distribution of a number of different services.
b. Nonobviousness. The leading case concerning the issue of nonobviousness is Graham v. John Deere, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). There, the United States Supreme Court discussed the analysis a district court should employ when determining whether a purported invention was obvious, given the prior art. The Court noted:
[D]ifferences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc. might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries have relevance.
Id. at 17-18, 86 S.Ct. at 694.
In determining the scope of the relevant prior art for purposes of nonobviousness analysis, the Court must presume full knowledge by the inventor of all of the prior art in his field which is "reasonably pertinent to the particular problem with which the inventor was involved." Stratoflex v. Aeroquip Corp., 713 F.2d 1530, 1535 (D.C.Cir.1983); In re Wood, 599 F.2d 1032, 1036 (Cust. & Pat.App.1979). Frank Fork was concerned with the problem of distributing various services throughout the floors of high-rise buildings. Consequently, for purposes of the present analysis, the pertinent prior art consists of all systems for distributing electricity and other services throughout the flooring of buildings, primarily the header duct system and a number of variations of the full bottom trench. The evidence at trial suggests that the pertinent level of skill in the art would be a person with a degree in engineering with experience in the installation and design of electrified floor systems.
The prior art had a number of drawbacks, including the requirement of a large inventory of various size pans and the resulting blind condition. The blind condition resulted in increased cost of installation and less flexibility. The Fork 051 trench remedied the blind condition by rendering the cells in the bottom of the trench visible. In addition, the absence in the Fork 051 trench of a metal bottom and concrete layer between the bottom of the trench made the task of accessing the cells much easier and less expensive.
These differences in function resulted directly from the fact that the Fork 051 had a structure different than previous systems. The limitations in the previous systems arose largely due to the fact that they employed trenches with bottoms. While the Fork 051 trench has a bottom for purposes of safety codes, it has no bottom which inhibits access to the cells for the distribution of various services. This fundamental difference between the Fork 051 Patent and the prior art cannot be over-emphasized. While it seems simple in hindsight, the persons skilled in the art did not conceive of this practical solution to the various problems inherent in the prior art before Frank Fork.
Mac-Fab argues that the Fork 051 is essentially a combination of elements of the Canadian 866 patent and the Weissman 775 patent. Defendant notes that the Canadian patent, which describes a full-bottomed trench common in the art, provides that the access holes in the bottom of the trench could be pre-punched in the factory. This is significant, Mac-Fab contends, because a Canadian 866 full-bottomed trench with pre-punched access holes is not fundamentally different than the Fork 051 trench with horizontal closures.
However, in the actual practice of the prior art, it was not feasible to pre-punch holes in the bottom of a full-bottomed trench at the factory and then transport the trench to the building site for installation. Technicians in the factory had a difficult *977 time pre-punching the holes in the bottom of the trench so that they would fall in alignment with the placement of the cells in the underlying subfloor. Although the parties presented conflicting evidence as to whether a concrete ingress problem precluded practitioners of the prior art from using full-bottomed trenches with pre-punched holes, the practitioners, as a matter of fact did not use this type of system.
The defendant failed to demonstrate that the Fork 051 Patent did not satisfy the statutory requirements of patentability. The Court finds that the Fork 051 Patent claims depict an invention that was nonobvious and had both great utility and novelty.

B. Infringement.

Mac-Fab unquestionably produced trench components and provided layout and installation instructions for a number of job sites. Consequently, if the flooring systems assembled at those sites infringed the Fork 051 Patent, defendant induced infringement and contributorily infringed the patent in accordance with 35 U.S.C. §§ 271(b) and 271(c). The Court will first determine whether Mac-Fab literally infringed the Fork 051 Patent, and will then consider whether defendant infringed the patent under the doctrine of equivalents. As a part of the latter inquiry, the Court will consider whether the doctrine of file wrapper estoppel precludes plaintiff from prosecuting this case under an equivalents argument.
The Court can conduct an infringement analysis, though, only after determining the proper scope of the claims in the patent. The key claim interpretation issue in this suit concerns Claim 1, which describes, in pertinent part, a "sub-assembly extending transversely across said crests of said metal subfloor and being bottomless." Plaintiff contends that the defendant's product, in particular its "intermittent bottomless trench," infringes this crucial claim. Defendant Mac-Fab argues, however, that because it employs horizontal closures over certain portions of the sub-flooring between the opposite sides of the trench structures, its product is not "bottomless" as contemplated in Claim 1.
Although this argument has some force, the Court finds that the intermittent bottomless trench assemblies sold by defendant are, for purposes of infringement analysis, "bottomless." The defendant's product, like the Fork 051 Patent, has no bottom in the portions of the trench directly over the cells. The key to the Fork 051 Patent is the ease with which the cells in the sub-assembly may be accessed. The fact that the defendant's trench has horizontal closures in other areas of the trench does not change the fact that it is bottomless in the crucial portions of the trench.

1. Literal infringement.

Defendant Mac-Fab is guilty of literal infringement if its products "embody every element of the claim[s]" in the Fork 051 Patent. Builders Concrete v. Bremerton Concrete Products, 757 F.2d 255, 257 (D.C.Cir.1985), citing, Fay v. Cordesman, 109 U.S. 408, 420-21, 3 S.Ct. 236, 244-45, 27 L.Ed. 979 (1883), and Interdent Corp. v. U.S., 531 F.2d 547, 552 (Ct.Cl.1976). See also Palumbo v. Don-Joy Co., 762 F.2d 969, 974 (D.C.Cir.1985) ["Literal infringement may be found if the accused device falls within the scope of the asserted claims as properly interpreted. Thus, the asserted claims must be compared with the product accused of infringement."].
The floor assemblies which plaintiff Robertson contends infringe the Fork 051 Patent are illustrated by the structures installed in the GTE building in Tampa, the J.C. Penney building in Plano, Texas, the Travenol Laboratories building in the Chicago area, and the 7 World Trade Center building in New York. These structures, with the exception of the bottom floor assemblies installed at the J.C. Penney building, literally infringe Claims 1, 2, 8, 9, 13 and 14 of the Fork 051 Patent. The GTE, Travenol Laboratories and 7 World Trade Center floor assemblies are responsive to Claim 4 and the GTE and Travenol structures are also responsive to Claim 6.

*978 2. Doctrine of Equivalents.

A product violates a patent under the doctrine of equivalents if it "performs substantially the same function in substantially the same way to obtain the same result." Graver Tank Co. v. Linde Air Products, 339 U.S. 605, 610, 70 S.Ct. 854, 857, 94 L.Ed. 1097 (1950). In Graver Tank, the seminal case in the area of the doctrine of equivalents, the Supreme Court stated that:
[C]onsideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform . . .
Id. at 609, 70 S.Ct. at 857. Consequently, even if the presence of the horizontal closures means that the Mac-Fab products are not "bottomless" and, therefore, the Mac-Fab products do not infringe Claim 1 in the Fork 051 Patent, those products definitely infringe Claim 1 under the doctrine of equivalents. In essence, the Fork 051 trench assembly works well because of the absence of a bottom in those portions of the trench directly over the cells, which provides ease of entry into the cells while satisfying the requirements of the National Electrical Code. The Mac-Fab products closely resemble the Fork 051 structure and have enjoyed commercial success, if at all, as a result of that resemblance. Essentially, then, the Mac-Fab "intermittent bottomless trench" works the same way as the Fork 051 trench.
Defendant Mac-Fab contends that the doctrine of file wrapper estoppel, which is a limitation on the doctrine of equivalents, precludes plaintiff from prevailing on its claim of infringement under an equivalents theory. This limitation prevents a plaintiff from relying on a specific interpretation of a claim which that party was required by the Patent Office to eliminate before the Office would approve the application. Graham v. John Deere Co., 383 U.S. 1, 33, 86 S.Ct. 684, 701, 15 L.Ed.2d 545 (1985).
In this case, defendant asserts that the plaintiff made two filings with the Patent Office, an initial filing and a continuation filing. Defendant further contends that the Patent Office refused to approve the initial filing because it did not represent a significant departure from the prior art, consisting primarily of full-bottomed trench sub-assemblies. As a result, Mac-Fab claims, plaintiff Robertson cannot now prosecute an infringement action against products which Mac-Fab contends are simply full-bottomed trenches with the bottoms partially removed.
As plaintiff notes, however, the defendant's arguments on this point rest on an incorrect factual premise. The defendant's products do not consist of the traditional full-bottomed trenches. In most cases, defendant Mac-Fab installed the horizontal closures in the field. Where the defendant did employ base pans with bottoms, it selectively removed the bottoms in those portions of trench where the access to the cells was required. It makes little difference whether the horizontal closures over the non-cellular portions of the floor are left in the trench while the other portions are removed or the closures are inserted in pertinent places over the non-cellular units. The Court finds that the facts presented by defendant do not justify the application of file wrapper estoppel to prevent plaintiff from prevailing on its infringement by equivalents claim.

C. Estoppel and inequitable conduct.

Mac-Fab contends that plaintiff Robertson should be estopped from prosecuting this action as to the V-Line trench floor structure installed in the 7 World Trade Center building because Robertson allegedly suggested to the proponent of the V-Line assembly that it was not interested in licensing his invention and recommended that he take the product to another manufacturer. However, defendant Mac-Fab was only able to offer hearsay evidence in support of its contention, and plaintiff strenuously objected at trial to the admission of that evidence. The Court reserved its ruling on the plaintiff's objections, and now holds that the testimony of defendant's President on this point constituted *979 inadmissible hearsay as defined in Fed.R. Evid. 801. Consequently, defendant failed to carry its burden on this contention.
Defendant also asserts that plaintiff Robertson improperly withheld prior art citations from the Patent Office when it prosecuted the application for the Fork 051 Patent. In particular, Mac-Fab claims that Robertson withheld the existence of the Weissman Patent from the Patent Office. Defendant claims, in effect, that if the Patent Office had known of the Weissman Patent, it would have refused to grant approval of the Fork 051 Application. However, as discussed in the portion of this Memorandum concerning the validity of the Fork 051 Patent, the Weissman Patent has very little connection to the technology presented to the Patent Office by Frank Fork. The Court finds that defendant's contentions on this point have no merit.

ORDER
In accordance with the Memorandum filed today,
IT IS HEREBY ORDERED that plaintiff H.H. Robertson's First Motion to Expand Record is DENIED and the Second and Third Motions are SUSTAINED.
IT IS FURTHER ORDERED that plaintiff's exhibits 423-27 are received into evidence and exhibits 421 and 422 are refused.
IT IS FURTHER ORDERED AND DECLARED that United States Patent No. 3,721,051 is valid, and has been infringed by inducement and contributorily infringed by defendant Mac-Fab Products, Inc.
IT IS FURTHER ORDERED that defendant Mac-Fab Products, Inc. is permanently enjoined from further infringement by inducement and contributory-infringement of United States Patent No. 3,721,051.
IT IS FURTHER ORDERED that Judgment on defendant's counterclaim is entered in favor of plaintiff.
IT IS FINALLY ORDERED that a hearing on the issue of damages, costs and attorneys' fees shall be scheduled at a time to be agreed on by the parties and the Court.

APPENDIX

3,721,051
It will be appreciated that placement of the telephone connector strip units 142 within the electrical cable trench provides several distinct advantages. For example, removal of the multitude of telephone connector strip units from the telephone closet permits the size of the telephone closet to be reduced. Inasmuch as all connections can be made within the electrical cable trench, the number of multi-conductor main telephone cable runs may be reduced. A reduction in the number of multi-conductor main telephone cable runs also permits a reduction in the size of the electrical cable trench. The close proximity of the telephone connector strip units to the zone being serviced, will facilitate installation of new telephone circuits and may facilitate tracing telephone line interruptions within that zone.
It will be appreciated that the connector strip units 142 positioned within the present trench T may also be employed to provide circuit connections for other telecommunications systems, such as computers, internal communications, auxiliary signals and the like.
I claim:
1. In an electrical wiring distributing floor structure including a metal subfloor and an overlying layer of concrete; said metal subfloor presenting alternating crests and troughs, and including metal cellular units providing generally parallel enclosed cells; the improvement comprising:
a sub-assembly including
opposite sides, each independently anchored in said concrete in fixed spaced-apart relationship; and
a cover plate spanning the distance between said opposite sides;
said sub-assembly extending transversely across said crests of said metal subfloor and being bottomless, whereby that upper surface portion of said metal subfloor in the region between said opposite sides, cooperates with said sub-assembly *980 to create an underfloor electrical cable trench;
said upper surface portion confronting said cover plate and being exposed to view when said cover plate is removed.
2. The improvement defined in claim 1 wherein said layer of concrete extends inwardly beneath said opposite sides and fills said troughs.
3. The improvement defined in claim 1 including a fire resistant material filling those portions of said troughs residing beneath and between said opposite sides.
4. The improvement defined in claim 1 including closure means disposed adjacent to each of said opposite sides for filling said troughs thereby to prevent ingress of said concrete into the interior of the formed cable trench.
5. The improvement defined in claim 4 wherein said closure means comprises plugs having a configuration corresponding to the transverse profile of said troughs and having upper edges engaging said opposite sides.
6. The improvement defined in claim 4 wherein said closure means comprises segments of said opposite sides extending downwardly into said troughs and essentially entirely closing said troughs.
7. The improvement defined in claim 4 wherein said closure means comprises separate members, one extending along each said opposite sides and presenting generally vertical segments extending into and essentially entirely closing said troughs.
8. The improvement defined in claim 1 wherein each of said opposite sides comprises
a side rail supporting one edge of said cover plate, and
a sub-rail positioned between said side rail and said crests of said metal subfloor.
9. The improvement defined in claim 1 including:
an enclosed raceway extending downwardly from
said cover plate between said side rails, said enclosed raceway including a bottom wall provided with longitudinally spaced openings exposing said crests.
10. The improvement defined in claim 9 wherein said bottom wall comprises longitudinally spaced transverse strips each positioned in the region of one of said troughs.
11. The improvement defined in claim 10 wherein said transverse strips are positioned below the level of said crests.
12. The improvement defined in claim 9 wherein said bottom wall comprises longitudinally spaced transverse strips each spanning the distance between adjacent ones of said crests.
13. The improvement defined in claim 9 wherein said enclosed raceway comprises:
a generally U-shaped channel including upstanding side walls adjoining said bottom wall; and
spaced-apart side plates, each extending downwardly from said cover plate and disposed adjacent to one of said upstanding side walls.
14. The improvement defined in claim 9 wherein said raceway has an open top which is closed by said cover plate, said openings being exposed to view when said cover plate is removed.
15. The improvement defined in claim 1 including a multi-contact cable connector strip unit positioned
in one of said troughs within said sub-assembly.
16. The improvement defined in claim 15 wherein said connector strip unit resides below the level of said crests.

* * * * * *